Justice KENNEDY delivered the opinion of the Court.
The jury is a central foundation of our justice system and our democracy. Whatever its imperfections in a particular case, the jury is a necessary check on governmental power. The jury, over the centuries, has been an inspired, trusted, and effective instrument for resolving factual disputes and determining ultimate questions of guilt or innocence in criminal cases. Over the long course its judgments find acceptance in the community, an acceptance essential to respect for the rule of law. The jury is a tangible implementation of the principle that the law comes from the people.
In the era of our Nation's founding, the right to a jury trial already had existed and evolved for centuries, through and alongside the common law. The jury was considered a fundamental safeguard of individual liberty. See The Federalist No. 83, p. 451 (B. Warner ed. 1818) (A. Hamilton). The right to a jury trial in criminal cases was part of the Constitution as first drawn, and it was restated in the Sixth Amendment. Art. III, § 2, cl. 3 ; Amdt. 6.
*861 By operation of the Fourteenth Amendment, it is applicable to the States. Duncan v. Louisiana, 391 U.S. 145, 149-150, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).
Like all human institutions, the jury system has its flaws, yet experience shows that fair and impartial verdicts can be reached if the jury follows the court's instructions and undertakes deliberations that are honest, candid, robust, and based on common sense. A general rule has evolved to give substantial protection to verdict finality and to assure jurors that, once their verdict has been entered, it will not later be called into question based on the comments or conclusions they expressed during deliberations. This principle, itself centuries old, is often referred to as the no-impeachment rule. The instant case presents the question whether there is an exception to the no-impeachment rule when, after the jury is discharged, a juror comes forward with compelling evidence that another juror made clear and explicit statements indicating that racial animus was a significant motivating factor in his or her vote to convict.
I
State prosecutors in Colorado brought criminal charges against petitioner, Miguel Angel Peña-Rodriguez, based on the following allegations. In 2007, in the bathroom of a Colorado horse-racing facility, a man sexually assaulted two teenage sisters. The girls told their father and identified the man as an employee of the racetrack. The police located and arrested petitioner. Each girl separately identified petitioner as the man who had assaulted her.
The State charged petitioner with harassment, unlawful sexual contact, and attempted sexual assault on a child. Before the jury was empaneled, members of the venire were repeatedly asked whether they believed that they could be fair and impartial in the case. A written questionnaire asked if there was "anything about you that you feel would make it difficult for you to be a fair juror." App. 14. The court repeated the question to the panel of prospective jurors and encouraged jurors to speak in private with the court if they had any concerns about their impartiality. Defense counsel likewise asked whether anyone felt that "this is simply not a good case" for them to be a fair juror. Id., at 34. None of the empaneled jurors expressed any reservations based on racial or any other bias. And none asked to speak with the trial judge.
After a 3-day trial, the jury found petitioner guilty of unlawful sexual contact and harassment, but it failed to reach a verdict on the attempted sexual assault charge. When the jury was discharged, the court gave them this instruction, as mandated by Colorado law:
"The question may arise whether you may now discuss this case with the lawyers, defendant, or other persons. For your guidance the court instructs you that whether you talk to anyone is entirely your own decision.... If any person persists in discussing the case over your objection, or becomes critical of your service either before or after any discussion has begun, please report it to me." Id., at 85-86.
Following the discharge of the jury, petitioner's counsel entered the jury room to discuss the trial with the jurors. As the room was emptying, two jurors remained to speak with counsel in private. They stated that, during deliberations, another juror had expressed anti-Hispanic bias toward petitioner and petitioner's alibi witness. Petitioner's counsel reported this to the court and, with the court's supervision, obtained sworn affidavits from the two jurors.
*862 The affidavits by the two jurors described a number of biased statements made by another juror, identified as Juror H.C. According to the two jurors, H.C. told the other jurors that he "believed the defendant was guilty because, in [H.C.'s] experience as an ex-law enforcement officer, Mexican men had a bravado that caused them to believe they could do whatever they wanted with women." Id ., at 110. The jurors reported that H.C. stated his belief that Mexican men are physically controlling of women because of their sense of entitlement, and further stated, " 'I think he did it because he's Mexican and Mexican men take whatever they want.' " Id., at 109. According to the jurors, H.C. further explained that, in his experience, "nine times out of ten Mexican men were guilty of being aggressive toward women and young girls." Id., at 110. Finally, the jurors recounted that Juror H.C. said that he did not find petitioner's alibi witness credible because, among other things, the witness was " 'an illegal.' " Ibid. (In fact, the witness testified during trial that he was a legal resident of the United States.)
After reviewing the affidavits, the trial court acknowledged H.C.'s apparent bias. But the court denied petitioner's motion for a new trial, noting that "[t]he actual deliberations that occur among the jurors are protected from inquiry under [Colorado Rule of Evidence] 606(b)." Id ., at 90. Like its federal counterpart, Colorado's Rule 606(b) generally prohibits a juror from testifying as to any statement made during deliberations in a proceeding inquiring into the validity of the verdict. See Fed. Rule Evid. 606(b). The Colorado Rule reads as follows:
"(b) Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jurors' attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form. A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying." Colo. Rule Evid. 606(b) (2016).
The verdict deemed final, petitioner was sentenced to two years' probation and was required to register as a sex offender. A divided panel of the Colorado Court of Appeals affirmed petitioner's conviction, agreeing that H.C.'s alleged statements did not fall within an exception to Rule 606(b) and so were inadmissible to undermine the validity of the verdict. - -- P.3d ----, 2012 WL 5457362.
The Colorado Supreme Court affirmed by a vote of 4 to 3. 350 P.3d 287 (2015). The prevailing opinion relied on two decisions of this Court rejecting constitutional challenges to the federal no-impeachment rule as applied to evidence of juror misconduct or bias. See Tanner v. United States, 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987) ; Warger v. Shauers, 574 U.S. ----, 135 S.Ct. 521, 190 L.Ed.2d 422 (2014). After reviewing those precedents, the court could find no "dividing line between different types of juror bias or misconduct," and thus no basis for permitting impeachment of the verdicts in petitioner's trial, notwithstanding H.C.'s apparent racial bias. 350 P.3d, at 293. This Court *863 granted certiorari to decide whether there is a constitutional exception to the no-impeachment rule for instances of racial bias. 578 U.S. ----, 136 S.Ct. 1513, 194 L.Ed.2d 602 (2016).
Juror H.C.'s bias was based on petitioner's Hispanic identity, which the Court in prior cases has referred to as ethnicity, and that may be an instructive term here. See, e.g., Hernandez v. New York, 500 U.S. 352, 355, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion). Yet we have also used the language of race when discussing the relevant constitutional principles in cases involving Hispanic persons. See, e.g.,ibid. ; Fisher v. University of Tex. at Austin, 570 U.S. ----, 133 S.Ct. 2411, 186 L.Ed.2d 474 (2013) ; Rosales-Lopez v. United States, 451 U.S. 182, 189-190, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981) (plurality opinion). Petitioner and respondent both refer to race, or to race and ethnicity, in this more expansive sense in their briefs to the Court. This opinion refers to the nature of the bias as racial in keeping with the primary terminology employed by the parties and used in our precedents.
II
A
At common law jurors were forbidden to impeach their verdict, either by affidavit or live testimony. This rule originated in Vaise v. Delaval, 1 T.R. 11, 99 Eng. Rep. 944 (K.B. 1785). There, Lord Mansfield excluded juror testimony that the jury had decided the case through a game of chance. The Mansfield rule, as it came to be known, prohibited jurors, after the verdict was entered, from testifying either about their subjective mental processes or about objective events that occurred during deliberations.
American courts adopted the Mansfield rule as a matter of common law, though not in every detail. Some jurisdictions adopted a different, more flexible version of the no-impeachment bar known as the "Iowa rule." Under that rule, jurors were prevented only from testifying about their own subjective beliefs, thoughts, or motives during deliberations. See Wright v. Illinois & Miss. Tel. Co., 20 Iowa 195 (1866). Jurors could, however, testify about objective facts and events occurring during deliberations, in part because other jurors could corroborate that testimony.
An alternative approach, later referred to as the federal approach, stayed closer to the original Mansfield rule. See Warger, supra, at ----, 135 S.Ct., at 526. Under this version of the rule, the no-impeachment bar permitted an exception only for testimony about events extraneous to the deliberative process, such as reliance on outside evidence-newspapers, dictionaries, and the like-or personal investigation of the facts.
This Court's early decisions did not establish a clear preference for a particular version of the no-impeachment rule. In United States v. Reid, 12 How. 361, 13 L.Ed. 1023 (1852), the Court appeared open to the admission of juror testimony that the jurors had consulted newspapers during deliberations, but in the end it barred the evidence because the newspapers "had not the slightest influence" on the verdict. Id., at 366. The Reid Court warned that juror testimony "ought always to be received with great caution." Ibid. Yet it added an important admonition: "cases might arise in which it would be impossible to refuse" juror testimony "without violating the plainest principles of justice." Ibid.
In a following case the Court required the admission of juror affidavits stating that the jury consulted information that *864 was not in evidence, including a prejudicial newspaper article. Mattox v. United States, 146 U.S. 140, 151, 13 S.Ct. 50, 36 L.Ed. 917 (1892). The Court suggested, furthermore, that the admission of juror testimony might be governed by a more flexible rule, one permitting jury testimony even where it did not involve consultation of prejudicial extraneous information. Id., at 148-149, 13 S.Ct. 50 ; see also Hyde v. United States, 225 U.S. 347, 382-384, 32 S.Ct. 793, 56 L.Ed. 1114 (1912) (stating that the more flexible Iowa rule "should apply," but excluding evidence that the jury reached the verdict by trading certain defendants' acquittals for others' convictions).
Later, however, the Court rejected the more lenient Iowa rule. In McDonald v. Pless, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915), the Court affirmed the exclusion of juror testimony about objective events in the jury room. There, the jury allegedly had calculated a damages award by averaging the numerical submissions of each member. Id., at 265-266, 35 S.Ct. 783. As the Court explained, admitting that evidence would have "dangerous consequences": "no verdict would be safe" and the practice would "open the door to the most pernicious arts and tampering with jurors." Id., at 268, 35 S.Ct. 783 (internal quotation marks omitted). Yet the Court reiterated its admonition from Reid, again cautioning that the no-impeachment rule might recognize exceptions "in the gravest and most important cases" where exclusion of juror affidavits might well violate "the plainest principles of justice." 238 U.S., at 269, 35 S.Ct. 783 (quoting Reid, supra, at 366; internal quotation marks omitted).
The common-law development of the no-impeachment rule reached a milestone in 1975, when Congress adopted the Federal Rules of Evidence, including Rule 606(b). Congress, like the McDonald Court, rejected the Iowa rule. Instead it endorsed a broad no-impeachment rule, with only limited exceptions.
The version of the rule that Congress adopted was "no accident." Warger, 574 U.S., at ----, 135 S.Ct., at 527. The Advisory Committee at first drafted a rule reflecting the Iowa approach, prohibiting admission of juror testimony only as it related to jurors' mental processes in reaching a verdict. The Department of Justice, however, expressed concern over the preliminary rule. The Advisory Committee then drafted the more stringent version now in effect, prohibiting all juror testimony, with exceptions only where the jury had considered prejudicial extraneous evidence or was subject to other outside influence. Rules of Evidence for United States Courts and Magistrates, 56 F.R.D. 183, 265 (1972). The Court adopted this second version and transmitted it to Congress.
The House favored the Iowa approach, but the Senate expressed concern that it did not sufficiently address the public policy interest in the finality of verdicts. S.Rep. No. 93-1277, pp. 13-14 (1974). Siding with the Senate, the Conference Committee adopted, Congress enacted, and the President signed the Court's proposed rule. The substance of the Rule has not changed since 1975, except for a 2006 modification permitting evidence of a clerical mistake on the verdict form. See 574 U.S., at ----, 135 S.Ct. 521.
The current version of Rule 606(b) states as follows:
"(1) Prohibited Testimony or Other Evidence . During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's *865 vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.
"(2) Exceptions. A juror may testify about whether:
"(A) extraneous prejudicial information was improperly brought to the jury's attention;
"(B) an outside influence was improperly brought to bear on any juror; or
"(C) a mistake was made in entering the verdict on the verdict form."
This version of the no-impeachment rule has substantial merit. It promotes full and vigorous discussion by providing jurors with considerable assurance that after being discharged they will not be summoned to recount their deliberations, and they will not otherwise be harassed or annoyed by litigants seeking to challenge the verdict. The rule gives stability and finality to verdicts.
B
Some version of the no-impeachment rule is followed in every State and the District of Columbia. Variations make classification imprecise, but, as a general matter, it appears that 42 jurisdictions follow the Federal Rule, while 9 follow the Iowa Rule. Within both classifications there is a diversity of approaches. Nine jurisdictions that follow the Federal Rule have codified exceptions other than those listed in Federal Rule 606(b). See Appendix, infra . At least 16 jurisdictions, 11 of which follow the Federal Rule, have recognized an exception to the no-impeachment bar under the circumstances the Court faces here: juror testimony that racial bias played a part in deliberations. Ibid. According to the parties and amici, only one State other than Colorado has addressed this issue and declined to recognize an exception for racial bias. See Commonwealth v. Steele, 599 Pa. 341, 377-379, 961 A.2d 786, 807-808 (2008).
The federal courts, for their part, are governed by Federal Rule 606(b), but their interpretations deserve further comment. Various Courts of Appeals have had occasion to consider a racial bias exception and have reached different conclusions. Three have held or suggested there is a constitutional exception for evidence of racial bias. See United States v. Villar, 586 F.3d 76, 87-88 (C.A.1 2009) (holding the Constitution demands a racial-bias exception); United States v. Henley, 238 F.3d 1111, 1119-1121 (C.A.9 2001) (finding persuasive arguments in favor of an exception but not deciding the issue); Shillcutt v. Gagnon, 827 F.2d 1155, 1158-1160 (C.A.7 1987) (observing that in some cases fundamental fairness could require an exception). One Court of Appeals has declined to find an exception, reasoning that other safeguards inherent in the trial process suffice to protect defendants' constitutional interests. See United States v. Benally, 546 F.3d 1230, 1240-1241 (C.A.10 2008). Another has suggested as much, holding in the habeas context that an exception for racial bias was not clearly established but indicating in dicta that no such exception exists. See Williams v. Price, 343 F.3d 223, 237-239 (C.A.3 2003) (Alito, J.). And one Court of Appeals has held that evidence of racial bias is excluded by Rule 606(b), without addressing whether the Constitution may at times demand an exception. See Martinez v. Food City, Inc., 658 F.2d 369, 373-374 (C.A.5 1981).
C
In addressing the scope of the common-law no-impeachment rule before Rule 606(b)'s adoption, the Reid and McDonald Courts noted the possibility of an exception to the rule in the "gravest and most *866 important cases." Reid, 12 How., at 366 ; McDonald, 238 U.S., at 269, 35 S.Ct. 783. Yet since the enactment of Rule 606(b), the Court has addressed the precise question whether the Constitution mandates an exception to it in just two instances.
In its first case, Tanner, 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90, the Court rejected a Sixth Amendment exception for evidence that some jurors were under the influence of drugs and alcohol during the trial. Id., at 125, 107 S.Ct. 2739. Central to the Court's reasoning were the "long-recognized and very substantial concerns" supporting "the protection of jury deliberations from intrusive inquiry." Id., at 127, 107 S.Ct. 2739. The Tanner Court echoed McDonald 's concern that, if attorneys could use juror testimony to attack verdicts, jurors would be "harassed and beset by the defeated party," thus destroying "all frankness and freedom of discussion and conference." 483 U.S., at 120, 107 S.Ct. 2739 (quoting McDonald, supra, at 267-268, 35 S.Ct. 783 ). The Court was concerned, moreover, that attempts to impeach a verdict would "disrupt the finality of the process" and undermine both "jurors' willingness to return an unpopular verdict" and "the community's trust in a system that relies on the decisions of laypeople." 483 U.S., at 120-121, 107 S.Ct. 2739.
The Tanner Court outlined existing, significant safeguards for the defendant's right to an impartial and competent jury beyond post-trial juror testimony. At the outset of the trial process, voir dire provides an opportunity for the court and counsel to examine members of the venire for impartiality. As a trial proceeds, the court, counsel, and court personnel have some opportunity to learn of any juror misconduct. And, before the verdict, jurors themselves can report misconduct to the court. These procedures do not undermine the stability of a verdict once rendered. Even after the trial, evidence of misconduct other than juror testimony can be used to attempt to impeach the verdict. Id., at 127, 107 S.Ct. 2739. Balancing these interests and safeguards against the defendant's Sixth Amendment interest in that case, the Court affirmed the exclusion of affidavits pertaining to the jury's inebriated state. Ibid.
The second case to consider the general issue presented here was Warger, 574 U.S. ----, 135 S.Ct. 521, 190 L.Ed.2d 422. The Court again rejected the argument that, in the circumstances there, the jury trial right required an exception to the no-impeachment rule. Warger involved a civil case where, after the verdict was entered, the losing party sought to proffer evidence that the jury forewoman had failed to disclose prodefendant bias during voir dire . As in Tanner, the Court put substantial reliance on existing safeguards for a fair trial. The Court stated: "Even if jurors lie in voir dire in a way that conceals bias, juror impartiality is adequately assured by the parties' ability to bring to the court's attention any evidence of bias before the verdict is rendered, and to employ nonjuror evidence even after the verdict is rendered." 574 U.S., at ----, 135 S.Ct., at 529.
In Warger , however, the Court did reiterate that the no-impeachment rule may admit exceptions. As in Reid and McDonald, the Court warned of "juror bias so extreme that, almost by definition, the jury trial right has been abridged." 574 U.S., at ---- - ----, n. 3, 135 S.Ct., at 529, n. 3. "If and when such a case arises," the Court indicated it would "consider whether the usual safeguards are or are not sufficient to protect the integrity of the process." Ibid.
The recognition in Warger that there may be extreme cases where the jury trial *867 right requires an exception to the no-impeachment rule must be interpreted in context as a guarded, cautious statement. This caution is warranted to avoid formulating an exception that might undermine the jury dynamics and finality interests the no-impeachment rule seeks to protect. Today, however, the Court faces the question that Reid,McDonald, and Warger left open. The Court must decide whether the Constitution requires an exception to the no-impeachment rule when a juror's statements indicate that racial animus was a significant motivating factor in his or her finding of guilt.
III
It must become the heritage of our Nation to rise above racial classifications that are so inconsistent with our commitment to the equal dignity of all persons. This imperative to purge racial prejudice from the administration of justice was given new force and direction by the ratification of the Civil War Amendments.
"[T]he central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the States." McLaughlin v. Florida, 379 U.S. 184, 192, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964). In the years before and after the ratification of the Fourteenth Amendment, it became clear that racial discrimination in the jury system posed a particular threat both to the promise of the Amendment and to the integrity of the jury trial. "Almost immediately after the Civil War, the South began a practice that would continue for many decades: All-white juries punished black defendants particularly harshly, while simultaneously refusing to punish violence by whites, including Ku Klux Klan members, against blacks and Republicans." Forman, Juries and Race in the Nineteenth Century, 113 Yale L.J. 895, 909-910 (2004). To take one example, just in the years 1865 and 1866, all-white juries in Texas decided a total of 500 prosecutions of white defendants charged with killing African-Americans. All 500 were acquitted. Id., at 916. The stark and unapologetic nature of race-motivated outcomes challenged the American belief that "the jury was a bulwark of liberty," id., at 909, and prompted Congress to pass legislation to integrate the jury system and to bar persons from eligibility for jury service if they had conspired to deny the civil rights of African-Americans, id., at 920-930. Members of Congress stressed that the legislation was necessary to preserve the right to a fair trial and to guarantee the equal protection of the laws. Ibid.
The duty to confront racial animus in the justice system is not the legislature's alone. Time and again, this Court has been called upon to enforce the Constitution's guarantee against state-sponsored racial discrimination in the jury system. Beginning in 1880, the Court interpreted the Fourteenth Amendment to prohibit the exclusion of jurors on the basis of race. Strauder v. West Virginia, 100 U.S. 303, 305-309, 25 L.Ed. 664 (1880). The Court has repeatedly struck down laws and practices that systematically exclude racial minorities from juries. See, e.g., Neal v. Delaware, 103 U.S. 370, 26 L.Ed. 567 (1881) ; Hollins v. Oklahoma, 295 U.S. 394, 55 S.Ct. 784, 79 L.Ed. 1500 (1935) (per curiam ); Avery v. Georgia, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953) ; Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954) ; Castaneda v. Partida, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). To guard against discrimination in jury selection, the Court has ruled that no litigant may exclude a prospective juror on the basis of race. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) ; Edmonson v.
*868 Leesville Concrete Co., 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) ; Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992). In an effort to ensure that individuals who sit on juries are free of racial bias, the Court has held that the Constitution at times demands that defendants be permitted to ask questions about racial bias during voir dire . Ham v. South Carolina, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973) ; Rosales-Lopez, 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 ; Turner v. Murray, 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986).
The unmistakable principle underlying these precedents is that discrimination on the basis of race, "odious in all aspects, is especially pernicious in the administration of justice." Rose v. Mitchell, 443 U.S. 545, 555, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979). The jury is to be "a criminal defendant's fundamental 'protection of life and liberty against race or color prejudice.' " McCleskey v. Kemp, 481 U.S. 279, 310, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (quoting Strauder, supra, at 309). Permitting racial prejudice in the jury system damages "both the fact and the perception" of the jury's role as "a vital check against the wrongful exercise of power by the State." Powers v. Ohio, 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) ; cf. Aldridge v. United States, 283 U.S. 308, 315, 51 S.Ct. 470, 75 L.Ed. 1054 (1931) ; Buck v. Davis, ante, at 22.
IV
A
This case lies at the intersection of the Court's decisions endorsing the no-impeachment rule and its decisions seeking to eliminate racial bias in the jury system. The two lines of precedent, however, need not conflict.
Racial bias of the kind alleged in this case differs in critical ways from the compromise verdict in McDonald, the drug and alcohol abuse in Tanner, or the pro-defendant bias in Warger . The behavior in those cases is troubling and unacceptable, but each involved anomalous behavior from a single jury-or juror-gone off course. Jurors are presumed to follow their oath, cf. Penry v. Johnson, 532 U.S. 782, 799, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001), and neither history nor common experience show that the jury system is rife with mischief of these or similar kinds. To attempt to rid the jury of every irregularity of this sort would be to expose it to unrelenting scrutiny. "It is not at all clear ... that the jury system could survive such efforts to perfect it." Tanner, 483 U.S., at 120, 107 S.Ct. 2739.
The same cannot be said about racial bias, a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice. This Court's decisions demonstrate that racial bias implicates unique historical, constitutional, and institutional concerns. An effort to address the most grave and serious statements of racial bias is not an effort to perfect the jury but to ensure that our legal system remains capable of coming ever closer to the promise of equal treatment under the law that is so central to a functioning democracy.
Racial bias is distinct in a pragmatic sense as well. In past cases this Court has relied on other safeguards to protect the right to an impartial jury. Some of those safeguards, to be sure, can disclose racial bias. Voir dire at the outset of trial, observation of juror demeanor and conduct during trial, juror reports before the verdict, and nonjuror evidence after trial are important mechanisms for discovering bias. Yet their operation may be compromised, or they may prove insufficient.
*869 For instance, this Court has noted the dilemma faced by trial court judges and counsel in deciding whether to explore potential racial bias at voir dire . See Rosales-Lopez, supra ; Ristaino v. Ross, 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976). Generic questions about juror impartiality may not expose specific attitudes or biases that can poison jury deliberations. Yet more pointed questions "could well exacerbate whatever prejudice might exist without substantially aiding in exposing it." Rosales-Lopez, supra, at 195, 101 S.Ct. 1629 (Rehnquist, J., concurring in result).
The stigma that attends racial bias may make it difficult for a juror to report inappropriate statements during the course of juror deliberations. It is one thing to accuse a fellow juror of having a personal experience that improperly influences her consideration of the case, as would have been required in Warger . It is quite another to call her a bigot.
The recognition that certain of the Tanner safeguards may be less effective in rooting out racial bias than other kinds of bias is not dispositive. All forms of improper bias pose challenges to the trial process. But there is a sound basis to treat racial bias with added precaution. A constitutional rule that racial bias in the justice system must be addressed-including, in some instances, after the verdict has been entered-is necessary to prevent a systemic loss of confidence in jury verdicts, a confidence that is a central premise of the Sixth Amendment trial right.
B
For the reasons explained above, the Court now holds that where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee.
Not every offhand comment indicating racial bias or hostility will justify setting aside the no-impeachment bar to allow further judicial inquiry. For the inquiry to proceed, there must be a showing that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict. To qualify, the statement must tend to show that racial animus was a significant motivating factor in the juror's vote to convict. Whether that threshold showing has been satisfied is a matter committed to the substantial discretion of the trial court in light of all the circumstances, including the content and timing of the alleged statements and the reliability of the proffered evidence.
The practical mechanics of acquiring and presenting such evidence will no doubt be shaped and guided by state rules of professional ethics and local court rules, both of which often limit counsel's post-trial contact with jurors. See 27 C. Wright & V. Gold, Federal Practice and Procedure: Evidence § 6076, pp. 580-583 (2d ed. 2007) (Wright); see also Variations of ABA Model Rules of Professional Conduct, Rule 3.5 (Sept. 15, 2016) (overview of state ethics rules); 2 Jurywork Systematic Techniques § 13:18 (2016-2017) (overview of Federal District Court rules). These limits seek to provide jurors some protection when they return to their daily affairs after the verdict has been entered. But while a juror can always tell counsel they do not wish to discuss the case, jurors in some instances may come forward of their own accord.
*870 That is what happened here. In this case the alleged statements by a juror were egregious and unmistakable in their reliance on racial bias. Not only did juror H.C. deploy a dangerous racial stereotype to conclude petitioner was guilty and his alibi witness should not be believed, but he also encouraged other jurors to join him in convicting on that basis.
Petitioner's counsel did not seek out the two jurors' allegations of racial bias. Pursuant to Colorado's mandatory jury instruction, the trial court had set limits on juror contact and encouraged jurors to inform the court if anyone harassed them about their role in the case. Similar limits on juror contact can be found in other jurisdictions that recognize a racial-bias exception. See, e.g., Fla. Standard Jury Instrs. in Crim. Cases No. 4.2 (West 2016) ("Although you are at liberty to speak with anyone about your deliberations, you are also at liberty to refuse to speak to anyone"); Mass. Office of Jury Comm'r, Trial Juror's Handbook (Dec. 2015) ("You are not required to speak with anyone once the trial is over.... If anyone tries to learn this confidential information from you, or if you feel harassed or embarrassed in any way, you should report it to the court ... immediately"); N.J. Crim. Model Jury Charges, Non 2C Charges, Dismissal of Jury (2014) ("It will be up to each of you to decide whether to speak about your service as a juror").
With the understanding that they were under no obligation to speak out, the jurors approached petitioner's counsel, within a short time after the verdict, to relay their concerns about H.C.'s statements. App. 77. A similar pattern is common in cases involving juror allegations of racial bias. See, e.g., Villar, 586 F.3d, at 78 (juror e-mailed defense counsel within hours of the verdict); Kittle v. United States, 65 A.3d 1144, 1147 (D.C.2013) (juror wrote a letter to the judge the same day the court discharged the jury); Benally, 546 F.3d, at 1231 (juror approached defense counsel the day after the jury announced its verdict). Pursuant to local court rules, petitioner's counsel then sought and received permission from the court to contact the two jurors and obtain affidavits limited to recounting the exact statements made by H.C. that exhibited racial bias.
While the trial court concluded that Colorado's Rule 606(b) did not permit it even to consider the resulting affidavits, the Court's holding today removes that bar. When jurors disclose an instance of racial bias as serious as the one involved in this case, the law must not wholly disregard its occurrence.
C
As the preceding discussion makes clear, the Court relies on the experiences of the 17 jurisdictions that have recognized a racial-bias exception to the no-impeachment rule-some for over half a century-with no signs of an increase in juror harassment or a loss of juror willingness to engage in searching and candid deliberations.
The experience of these jurisdictions, and the experience of the courts going forward, will inform the proper exercise of trial judge discretion in these and related matters. This case does not ask, and the Court need not address, what procedures a trial court must follow when confronted with a motion for a new trial based on juror testimony of racial bias. See 27 Wright 575-578 (noting a divergence of authority over the necessity and scope of an evidentiary hearing on alleged juror misconduct). The Court also does not decide the appropriate standard for determining when evidence of racial bias is sufficient to require that the verdict be set aside and a new trial be granted. Compare, *871 e.g., Shillcutt, 827 F.2d, at 1159 (inquiring whether racial bias "pervaded the jury room"), with, e.g., Henley, 238 F.3d, at 1120 ("One racist juror would be enough").
D
It is proper to observe as well that there are standard and existing processes designed to prevent racial bias in jury deliberations. The advantages of careful voir dire have already been noted. And other safeguards deserve mention.
Trial courts, often at the outset of the case and again in their final jury instructions, explain the jurors' duty to review the evidence and reach a verdict in a fair and impartial way, free from bias of any kind. Some instructions are framed by trial judges based on their own learning and experience. Model jury instructions likely take into account these continuing developments and are common across jurisdictions. See, e.g., 1A K. O'Malley, J. Grenig, & W. Lee, Federal Jury Practice and Instructions, Criminal § 10:01, p. 22 (6th ed. 2008) ("Perform these duties fairly. Do not let any bias, sympathy or prejudice that you may feel toward one side or the other influence your decision in any way"). Instructions may emphasize the group dynamic of deliberations by urging jurors to share their questions and conclusions with their colleagues. See, e.g., id ., § 20:01, at 841 ("It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching an agreement if you can do so without violence to individual judgment").
Probing and thoughtful deliberation improves the likelihood that other jurors can confront the flawed nature of reasoning that is prompted or influenced by improper biases, whether racial or otherwise. These dynamics can help ensure that the exception is limited to rare cases.
* * *
The Nation must continue to make strides to overcome race-based discrimination. The progress that has already been made underlies the Court's insistence that blatant racial prejudice is antithetical to the functioning of the jury system and must be confronted in egregious cases like this one despite the general bar of the no-impeachment rule. It is the mark of a maturing legal system that it seeks to understand and to implement the lessons of history. The Court now seeks to strengthen the broader principle that society can and must move forward by achieving the thoughtful, rational dialogue at the foundation of both the jury system and the free society that sustains our Constitution.
The judgment of the Supreme Court of Colorado is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.
It is so ordered.