NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0653n.06

No. 19-5934

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Nov 16, 2020
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |
| JEFFERY STOKES, | ) ) | |
| Defendant-Appellant. | ) ) | |

Before: MERRITT, KETHLEDGE, and WHITE, Circuit Judges.

KETHLEDGE, Circuit Judge. A jury found Jeffery Stokes guilty of conspiracies to distribute powder and crack cocaine. Stokes challenges his conviction, arguing that two references to his past drug dealing might have affected the trial's outcome and that the Sixth Amendment required the judge to instruct jurors to report racially biased statements in deliberations. We reject both arguments and affirm.

I.

Devane Robinson ran a $2 million enterprise selling crack and powder cocaine. Through a series of phone wiretaps, officers identified Robinson's suppliers and employees, one of whom was Jeffery Stokes. A grand jury charged Stokes and 17 other defendants with conspiracy to distribute powder cocaine, and Stokes and one other defendant with conspiracy to distribute crack cocaine.

Every defendant except Stokes pleaded guilty. Stokes went to trial, where the government called nine witnesses. On the first day, DEA Agent James Blanton explained how the government had investigated Robinson's drug ring. Agents had arranged six controlled buys from Robinson, set up a pole camera outside Robinson's main drug house (called "Spot One"), and wiretapped Robinson's phone as well as the phone of one of his suppliers. Blanton said that the government had collected only six days of wiretapped conversations between Stokes and Robinson because Stokes had been arrested early in the investigation for an unrelated crime.

A forensic chemist testified that substances seized from Robinson, his home, and one of his drug houses were crack and powder cocaine. A co-conspirator, Tomichael Carter, testified that he had bought powder and crack cocaine from Robinson. Usually, Carter said, one of Robinson's employees, Timothy Thomas, would deliver drugs to Carter by stuffing them in Carter's outdoor grill; but Carter sometimes bought drugs at Spot One, where he once saw Stokes in the living room.

The next day the government led with Robinson's testimony, which described how he had run his cocaine enterprise. As the business grew, Robinson hired employees for Spot One: Thomas and Leslie Mitchell worked as doormen, and Christopher Holmes sold on the night shift. Robinson tried to work the day shift himself, but was often too busy to stay at Spot One all day. In early 2017, Robinson hired Stokes, who "had been wanting to come over and help out and make a little money."

Robinson would come to Spot One in the morning to cook crack and to set up the drug house. Stokes would arrive later—between 10:00 am and noon—to sell crack from the basement. When Stokes first started, Robinson stayed at Spot One with Stokes to "get him broke in." Once customers began to trust Stokes, Robinson left crack in the basement for Stokes to sell by himself.

But Robinson stayed available if problems arose. For example, Robinson would return to provide more crack if a seller was about to run out of drugs.

According to Robinson, Stokes also dealt powder cocaine. Robinson supplied Stokes with ounces of powder cocaine "[e]very week or two" over a six-month period.

To manage his business (and keep his family life separate), Robinson had three phones. The government had tapped the phone he would use for the "bigger people"—including Stokes— and had recorded conversations between Stokes and Robinson. On one day, Robinson texted Stokes at 10:23 a.m. to ask "what time he was swinging through." Stokes called back at 10:56 a.m. to let Robinson know he was on his way. At 2:26 p.m., Robinson called Stokes to tell him to "put that shit in that uh, that fudge round box . . . we use over there" and to "just stuff down in there, you know what I'm sayin'." (According to Robinson, the "shit" to be stuffed in the box was money that Stokes had earned from crack sales.) Stokes then called Robinson at 5:03 p.m. to ask him to "look in that seat right there where you at or around that seat man and see if you see a $50 [] bill down there," and told Robinson that he had earned the money from a "joog" he had made to his "little junky over there on sixth street." Three days later, Stokes called Robinson at 7:15 p.m. to ask if Holmes was "coming," or if he was "waiting on" Robinson. The next day, Stokes called Robinson to tell him that he was "almost like done, you know, we got a couple little giblets"; Robinson replied that he would "be through there [in] probably like 20 minutes." Stokes was arrested the following day.

Four other co-conspirators testified after Robinson. First, Richard Walker said that he had regularly bought crack from Robinson but had refused to buy from Holmes or Stokes. Walker noted that, on one occasion, he had seen Stokes sitting in the basement, next to Robinson, with a plate of crack in front of him. He also said that, if Robinson was away from Spot One during the

day, Stokes would be selling crack there. Second, Christopher Holmes explained that he had worked the night shift and that, when he had seen Stokes at Spot One, Stokes "would be leaving" as he "was coming." Third, Ronnie Rogers, who had bought powder cocaine from Robinson, said that he had seen Stokes give money to Robinson in exchange for drugs. Later, when Rogers was in jail, Stokes told Rogers that if "[a]nybody [who] was on this case said something about him, he was going to stick them up, stab them, kill them." Stokes approached Rogers in jail a second time to warn him that his name was in Stokes's indictment papers. Rogers then told his attorney that Stokes was threatening people who were cooperating with the government. Fourth, Thomas said that he had worked alone with Stokes for about two weeks and had watched Stokes sell crack. He also noted that he had seen Stokes at Spot One before Stokes had begun working as Robinson's crack dealer.

The government's final witness on day two was Investigator Philip Jinks, who had arrested Stokes after an investigator monitoring the pole camera told Jinks that Stokes was leaving Spot One. When Jinks arrested Stokes, he found no drugs on Stokes's person or in his car. The second day of trial then ended, and the government rested its case.

Stokes presented no evidence on the third day of trial. His entire defense consisted of attacks on his co-conspirators' credibility. On the first day, Stokes's attorney extensively questioned Agent Blanton about Robinson's credibility, and argued that the government was relying on Robinson's word alone to determine the amount of drugs dealt and to explain phone conversations tapped on Robinson's phone. Blanton responded that Robinson's story had remained consistent over time, and that the amounts described by Robinson had matched those described by six other co-defendants. Blanton also said that the tapped phone calls were incriminating not only because of Robinson's explanations of them, but also because Robinson

and Stokes had used "drug talk": words like "juug," which meant a "small drug deal," and "junkie," which meant a "drug addict."

At closing argument, Stokes argued that the testifying co-conspirators were lying to get a better plea deal. The jury apparently disagreed, convicting him on both counts. This appeal followed.

II.

A.

Stokes argues that the jury never should have heard two statements implying that Stokes had sold drugs before the conduct for which he was charged here. Stokes did not object to that testimony at trial, so we review only for plain error. *United States v. Knowles*, 623 F.3d 381, 385 (6th Cir. 2010).

Both statements occurred during Robinson's direct examination. Robinson made the first statement when he was testifying about his background with drugs:

> Q. Okay. Did you ever get involved with drugs?
>
> A. Yes. When I moved up here to Tennessee, I got involved in it. I was—just moved up here, just new people I was—came down here with some smokers, smoking weed and everything. I started to sell it to take care of my habit, because I didn't have a job or anything yet.
>
> Then I started moving out, meeting people. And then met a couple of friends, and they was selling crack cocaine. And I know how to do it from growing up in the neighbor—city, Oklahoma City is around, so I started dibbling, dabbling in that.
>
> **At the time is when I met Mr.—Mr. Boyd, Mr. Thomas, Mr. Stokes, Mr. Whitehead, and a couple of associates. We was intermingling, selling drugs back then.** I did that for a little while, and then I got caught, got arrested. I got arrested, I got put on probation, probation for about nine years. So I left it alone, stayed good, did the right thing for a while. Had a couple of good jobs.

The government then asked more questions about Robinson's background: where he worked, his prior conviction, and when he began selling drugs again. Robinson then testified at length about

how he had run his business, and eventually reached his decision to hire Stokes. When Robinson

was describing his work arrangement with Stokes, he made the second challenged statement:

> Q.    And what was your agreement regarding his working for you?
>
> A.    He would just come up whenever he can. Sometimes he'd be there, maybe like four days a week, because, you know, the schedule, you know, I mean, and I would just pay him a—pay him a dollar amount for each week that he was there. Sometimes pay him between—him starting out, I was trying to get him broke in. I wasn't just paying, so I would pay him 25 and $700 a week.
>
> Q.    I'm sorry?
>
> A.    Twenty-five and $700.
>
> Q.    25 and $700. Did you—you said you were trying to get him broke in. Did you teach him how to do it?
>
> A.    **No, no. I didn't teach him how to do it. He already knew how to do it.** I was just—because when people come by to buy stuff, they really just want to get it from me. And sometimes they don't feel comfortable getting somebody else, because they always feel like somebody trying to switch it out with them. You know, I mean, that's not the same thing that you had and all that kind of stuff. So just having it to where people see his face more, you know what I mean, and they would just accept, okay, it's the same thing. That's all I meant by breaking in.

Stokes contends that both statements were inadmissible evidence of his criminal

propensity—i.e., that Stokes had sold drugs before, and had acted "in accordance with" that

character by selling them again in this conspiracy. *See* Fed. R. Evid. 404(b). For this court to find

error, however, the district court must have deviated from a legal rule. *See United States v. Olano*,

507 U.S. 725, 732–33 (1993).

Here, neither party asked the district court to rule on the statements' admissibility, so the

court did not erroneously "admit" the evidence. Nor did the court have a categorical duty *sua*

*sponte* to "call the jury's attention to these 'other bad acts'" through a curative instruction. *United*

*States v. Henderson*, 626 F.3d 326, 338 (6th Cir. 2010). Moreover, on this record, the introduction

of those statements created no "manifest necessity" to declare a mistrial. *United States v. White*, 914 F.2d 747, 754 (6th Cir. 1990).

That said, Robinson's references at trial to Stokes's prior drug dealing were regrettable. The second statement—in response to the government's question whether Robinson had to "teach" Stokes to deal drugs—was especially unfortunate, given that the question did solicit the prior-act testimony that followed. Once Robinson had made the statements, however, the district court had three choices: declare a mistrial, give a curative instruction, or do nothing. The testimony was fleeting and likely did not have much influence on the jury's verdict, given the other evidence of guilt at trial. And a curative instruction would have only highlighted the two statements. The district court therefore did not plainly err when it chose not to act upon the statements.

B.

Stokes also argues that the Sixth Amendment required the district court to instruct the jurors that they "must inform the court of racially biased statements in deliberations." Stokes himself did not request such an instruction, so we review only for plain error. *United States v. Newsom*, 452 F.3d 593, 605 (6th Cir. 2006). There was none here, given that the very case upon which Stokes relies—*Peña-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017)—itself imposed no such requirement, nor are we aware of any court that has. *See id.* at 869, 870.

\* \* \*

The district court's judgment is affirmed.