NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

ANTHONY SCOTT AXTON, *Appellant.*

No. 1 CA-CR 19-0634
FILED 12-22-2020

Appeal from the Superior Court in Mohave County
No. S8015CR201801106
The Honorable Douglas R. Camacho, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Terry M. Crist, III
*Counsel for Appellee*

By Harriette P. Levitt
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Presiding Judge Paul J. McMurdie delivered the Court's decision, in which Judge Jennifer B. Campbell and Vice Chief Judge Kent E. Cattani joined.

---

**M c M U R D I E**, Judge:

**¶1**           Anthony Scott Axton appeals his convictions and sentences for one count each of armed robbery, aggravated robbery, kidnapping, misconduct involving body armor, three counts of aggravated assault, and two counts of attempted first-degree murder. For the following reasons, we affirm.

## FACTS[1] AND PROCEDURAL BACKGROUND

**¶2**           On July 1, 2018, Axton and an accomplice entered a Dollar General in Kingman, Arizona. Armed and wearing masks, they held an employee and bystander at gunpoint. They ordered the manager to open the store's safe, and the manager placed money from the safe's cash drawers inside a duffle bag. Axton and his accomplice left the store but encountered police officers before they could drive away. Axton began firing his rifle at the police from behind his truck. After intense gunfire, Axton fled on foot but was eventually arrested by the police. Police discovered he was wearing body armor and found a second rifle, ammunition, zip ties, duct tape, and headcovers inside his truck.

**¶3**           The State charged Axton with: (1) armed robbery, a class 2 felony; (2) aggravated robbery, a class 3 felony; (3) three counts of aggravated assault, two class 2 felonies and one class 3 felony; (4) two counts of attempted first-degree murder, both class 2 felonies; (5) kidnapping, a class 4 felony; (6) attempted kidnapping, a class 5 felony; and (7) misconduct involving body armor, a class 4 felony. The State alleged all offenses were dangerous under A.R.S. § 13-704. It further alleged the aggravating factors of an accomplice's presence, the expectation of

---

[1]      We view the facts in the light most favorable to upholding the verdict and resolve all reasonable inferences against the defendant. *State v. Mendoza*, 248 Ariz. 6, 11, ¶ 1, n.1 (App. 2019).

pecuniary gain, emotional harm, and the wearing of equipment meant to minimize the risk of injury from a deadly weapon.

¶4         Over sixty exhibits were admitted into evidence at trial, including photographs of Axton's body armor. Officer Brennan Cassidy testified that he took the body-armor pictures. Cassidy explained how each photo displayed a different body armor component, and all were admitted without objection. Similarly, Detective David Kinion photographed Axton's duffle bag and its contents, including the duct tape. Without objection, Kinion testified and described where he found the items and how he photographed them.

¶5         Before deliberations, two jurors were selected as alternates and excused. During deliberations, the jury informed the court that one of the jurors said he had previously seen Axton "in town as a crossdresser." The information was provided to the court by juror G.M. Upon receiving the note, the court paused the deliberations to interview the jurors individually. K.A. was identified as the juror who had previously seen Axton, and the other jurors confirmed K.A. had referred to Axton as a "crossdresser."

¶6         When questioned by the court, K.A. said that he had seen Axton once or twice before but only recognized him after seeing his driver's license. K.A. told the court that when he saw Axton previously, he "oftentimes had what looked like breasts and wore female clothing." K.A. stated he did not directly interact with Axton and had only seen him in passing. The court asked K.A. if he held any bias against Axton or men who wear women's clothing, or if the recognition would affect his deliberations. K.A. answered that it would not affect his decision-making and mentioned the cross-dressing merely because it was unusual and out-of-place. However, after the court questioned K.A., another juror reported that K.A. had made disparaging comments and believed that K.A. could not remain impartial.

¶7         During the court's questioning, it came to light that an argument occurred between K.A. and G.M. over whether to inform the court that K.A. recognized Axton. Several jury members were frustrated by G.M.'s insistence on providing the information to the court. G.M. was the only juror who believed it was a problem the court needed to consider. When asked by the court about their frustrations, several jurors expressed that they were irritated because of the deliberations' delay.

¶8        One juror believed that G.M. could not remain impartial and told the court that G.M. had stated: "crossdressers or transgenders should not be allowed in society." No other juror reported hearing this comment, although a different juror told the court that they also believed G.M. could no longer be fair. Several jurors said that G.M. appeared either "distressed," "taken aback," or "shocked" when she learned Axton might have worn women's clothing. When asked their opinions about G.M.'s reaction, two jurors believed she only reacted because she was unfamiliar with the term cross-dressing and was surprised by it. One of those jurors believed G.M.'s reaction stemmed from a concern for the deliberations' fairness. After interviewing every juror, the court did not recall G.M. for further clarification. Because G.M. was interviewed first, the court did not have the opportunity to inquire about her alleged statement or reactions.

¶9        When the court individually questioned each juror, all 12 told the court that they were not personally biased or otherwise influenced by the possibility that Axton cross-dressed. Apart from the two jurors who expressed concerns about K.A.'s and G.M.'s fairness, the other jurors believed everyone could remain fair and unbiased.

¶10        After approximately half of the jurors were questioned by the court, Axton's counsel requested that both K.A. and G.M. be struck from the jury and replaced with the alternates. Axton's counsel stated he was more concerned about K.A. than G.M. but requested G.M. be removed after hearing her alleged statements. In the alternative, Axton's counsel requested a mistrial. Over the objections of the State, the Court struck K.A. from the jury.

¶11        After the juror questioning concluded, Axton's counsel again requested that G.M. be struck from the jury but stated he was "not necessarily inclined to request a mistrial at this point as long as [K.A.] is struck." The court said it wished to conduct some research on the issue and recessed without ruling. After the break, the court did not further address Axton's request to strike G.M. *See State v. Hill*, 174 Ariz. 313, 323 (1993) (When a court fails to rule on a motion, the appellate court deems it denied.); *State v. Mendoza-Tapia*, 229 Ariz. 224, 231, ¶ 22 (App. 2012).

¶12        The court gave the parties a proposed reconstitution instruction for the jury. The instructions concerned only removing a single juror, K.A., and Axton's counsel did not object to the instruction.

¶13        The jury returned a guilty verdict on all counts, except for Count 8, the charge of attempted kidnapping. The jury further found that

the aggravating circumstances alleged by the State were proven beyond a reasonable doubt. After a sentencing hearing, the court sentenced Axton to concurrent and consecutive terms of imprisonment totaling 63 years' imprisonment, with 494 days' presentence incarceration credit.

¶14          Axton appealed, and we have jurisdiction under A.R.S. §§ 12-120.21(A)(1), 13-4031, and -4033(A)(1). Axton's appellate counsel filed a brief per *Anders v. California*, 386 U.S. 738 (1967), and *State v. Leon*, 104 Ariz. 297 (1969), certifying that, after a diligent search of the record, she found no arguable question of law that was not frivolous. Counsel asked this court to search the record for arguable issues. *See Penson v. Ohio*, 488 U.S. 75, 83 (1988); *State v. Clark*, 196 Ariz. 530, 537, ¶ 30 (App. 1999). Axton filed a *pro se* supplemental brief. In his supplemental brief, Axton argued: (1) the court improperly admitted photographic evidence of the body armor and duct tape, (2) the jury was prejudiced against him, and (3) multiple witnesses for the state improperly used notes during oral testimony or testified falsely. After reviewing the record, we issued a *Penson* order requesting the parties to address whether the superior court violated Axton's right to an impartial jury or abused its discretion by declining to either further question or strike juror G.M. from the jury.

## DISCUSSION

### A.     The Superior Court Did Not Err by Admitting Photographs of Axton's Body Armor and Duct Tape in Place of the Items.

¶15          Axton does not challenge the photographs' admission but instead argues that because the actual body armor and duct tape were not admitted into evidence, the jury "decided on fact[s] not admitted into evidence." However, Arizona courts regularly rely on photographs of items in place of the items. *See State v. Bouillon*, 112 Ariz. 238, 240-41 (1975); *State v. Raffaele*, 113 Ariz. 259, 262 (1976); *State v. Rose*, 121 Ariz. 131, 141 (1978). So long as the proponent complies with the Arizona Rules of Evidence, a court may properly rely on photographic evidence. *See Bouillon*, 112 Ariz. at 241.

¶16          In this case, the photographs were admitted correctly under Arizona Rule of Evidence 901(b)(1), which allows for identifying evidence through witness testimony. *State v. Haight-Gyuro*, 218 Ariz. 356, 358, ¶ 9 (App. 2008). Officer Cassidy testified that he took the body-armor photographs and explained how each photo identified a different component, thus satisfying Rule 901(b)(1). Similarly, Officer Kinion identified the pictures as those he took of the duct tape found in Axton's

truck. The photos of the body armor and duct tape were admitted correctly in the items' place.

**B.      The Superior Court Did Not Abuse Its Discretion or Violate Axton's Right to An Impartial Jury by Declining to Strike Juror G.M.**

¶17      The parties dispute what the proper standard of review is in this appeal. The State argues fundamental-error review is appropriate because Axton's trial counsel did not renew his motion to strike juror G.M. after the court returned from the recess. However, before the break, counsel twice moved to strike G.M. from the jury, thereby preserving the issue for review. *See State v. Totress*, 107 Ariz. 18, 20 (1971). While counsel "may not sit back and allow error to occur when a prompt objection might have allowed the court to cure the problem," that is not what happened here. *State v. Lichon*, 163 Ariz. 186, 189 (App. 1989).

¶18      Counsel first asked the court to remove G.M. immediately after the alleged statement was reported, and then again after the court finished questioning the jurors. Although counsel equivocated on the request for a mistrial, the two requests to strike G.M. were explicit and not withdrawn. Thus, the objection to G.M.'s presence on the jury was "brought to the attention of the trial court in a manner sufficient to advise the court that the error was not waived." *State v. Lujan*, 136 Ariz. 326, 328 (1983) (quoting *State v. Briggs*, 112 Ariz. 379, 382 (1975)). While it is true that counsel did not make a third request to strike G.M. after the recess and after hearing the proposed jury instruction, making the request twice was sufficient to make his objection clear and preserved for review. *State v. Henderson*, 210 Ariz. 561, 567, ¶ 18 (2005). Nevertheless, we hold the court did not abuse its discretion by refusing to strike or failing to question G.M. further for the reasons set forth below.

¶19      "Under the Sixth and Fourteenth Amendment to the United States Constitution, a criminal defendant is entitled to an impartial jury." *State v. Velazquez*, 216 Ariz. 300, 306, ¶ 14 (2007) (citing *Witherspoon v. Illinois*, 391 U.S. 510, 518 (1968)). "Even a single partial juror violates a defendant's constitutional right to a fair trial." *State v. Macias*, 249 Ariz. 335, 339, ¶ 10 (App. 2020) *United States v. Angulo*, 4 F.3d 843, 848 (9th Cir. 1993)). "The determination of whether to excuse a juror for cause is within the sound discretion of the trial court and should not be disturbed on appeal absent a clear showing of abuse." *State v. Cocio*, 147 Ariz. 277, 279–80 (1985), *abrogated on other grounds by State v. Nissley*, 241 Ariz. 327, 330, ¶ 11 (2017).

¶20        To establish an abuse of discretion, a defendant must show that the juror was biased such that he or she could not render a fair or impartial verdict. Ariz. R. Crim. P. 18.4(b); *Cocio*, 147 Ariz. at 280. However, if a juror assures the court that they can be fair and impartial, the juror need not be removed. *State v. Purcell*, 199 Ariz. 319, 323, ¶ 8 (App. 2001). Because the superior court can observe a juror, it is in the best position to determine whether those assurances are credible. *Id.* at ¶ 9.

¶21        The threshold issue in deciding whether a court must excuse a juror is not whether that juror personally holds prejudicial views. Instead, it is whether that juror can set aside those views and render an impartial verdict. *See, e.g.*, *State v. Munson*, 129 Ariz. 441, 442–44 (App. 1981) (declining to excuse prospective jurors who expressed racial bias but assured the court they could set that bias aside); *State v. Rose*, 121 Ariz. 131, 139 (1978) (declining to excuse a prospective juror who was a victim of kidnapping, when the juror assured the court he could set his experience aside to sit on a separate kidnapping case); *Cocio*, 147 Ariz. at 279–80 (declining to excuse a juror from a drunk driving manslaughter case, despite the juror's strong personal feelings about drinking and driving). Thus, even if a juror holds strong personal opinions, the court may allow the juror to remain, provided the court is convinced the juror will remain impartial.

¶22        When interviewed by the superior court, G.M. decisively and repeatedly stated the possibility that Axton cross-dressed would not affect her in any way. Moreover, G.M. herself reported K.A.'s recognition of Axton to the court over other jurors' objections. Despite the pressure from jurors to merely proceed with the deliberations, her insistence on informing the court could reasonably support its conclusion that G.M. would be impartial and committed to ensuring the deliberations remained fair. Only one juror reported hearing G.M.'s alleged statement regarding crossdressers. Although an additional juror was concerned about G.M.'s ability to remain fair, that juror's statements arose from the jury's internal disagreement regarding whether to report K.A.'s comment, rather than any prejudice held against Axton. The remaining jurors did not express concern about G.M.'s ability to be impartial.

¶23        The only evidence that G.M. held a prejudice against Axton comes from one juror's statement, which the superior court weighed against G.M.'s statements. The court's conclusion that G.M. could remain fair and unbiased was supported by sufficient evidence to fall within the court's discretion.

¶24        The court's conclusion is likewise supported by statements from Axton's counsel, who stated, "obviously I'm more concerned about [K.A.] than [G.M.]." Although Axton's counsel still requested G.M. be struck after hearing the alleged comment, he was not wholly convinced she held actual bias or prejudice against Axton. Trial counsel believed that the real issue regarding G.M. was that she "wanted to make sure that this was brought to the court's attention [rather] than necessarily something against my client." Thus, while counsel ultimately did move to remove G.M., his argument was equivocal and overshadowed by concerns about K.A.

¶25        The subsidiary issue is whether the jurors were contaminated by outside information about Axton's personal life, irrelevant to the State's charges. When irrelevant information is brought to the jurors' attention, a court's response should be tailored to the severity of the threat posed. *State v. Miller*, 178 Ariz. 555, 557 (1994). In *Miller*, our supreme court concluded the superior court erred when it failed to question the jury after one juror received a note from an excused alternate juror which read either "He's guilty" or "My vote is guilty." *Id.* The court reasoned, "the possibility of improper influence certainly warranted investigation." *Id.* There, the superior court failed to investigate and did not inquire whether any jurors were improperly influenced. *Id.*

¶26        But this case is not *Miller*. Here, the superior court interviewed each juror personally to explore the possibility of bias or impartiality. Each juror attested that they could remain fair and impartial despite the alleged cross-dressing. G.M. personally testified that she could remain fair and impartial throughout the deliberations. Although the court did not recall G.M. for questioning after learning about her alleged statement, the court continued to interview the remaining jurors, none of whom reported hearing the comment. The court conducted a reasonably thorough investigation that was commensurate with the threat of possible juror bias.

¶27        In his *Penson* brief, Axton cites *Pena-Rodriguez v. Colorado*, in which a juror made several prejudicial comments against Mexicans, including: "I think he did it because he's Mexican and Mexican men take whatever they want." 137 S. Ct. 855, 862 (2017). The jury convicted the defendant, and the trial court declined to order a new trial. *Id.* The Supreme Court concluded the juror's specific reliance on racial bias violated the defendant's right to an impartial jury and reversed. *Id.* at 870–71.

¶28        But *Pena-Rodriquez* is distinguishable from this case for several reasons. First, the statements in *Pena-Rodriguez* were revealed only

after the conclusion of the trial, and the court did not question the jurors regarding their ability to remain impartial. *Id.* at 862. In this case, the superior court questioned all jurors, including G.M. Second, two jurors in *Pena-Rodriguez* submitted affidavits that described at least five specific biased statements by the problematic juror. *Id.* In contrast, only one juror alleged that G.M. had made a single biased statement. Finally, the juror at issue in *Pena-Rodriguez* allegedly made five discriminatory statements and stated that he believed the defendant was guilty precisely because of the defendant's race, clearly demonstrating he could not set aside his biases. *Id.* There is no evidence here that G.M. relied on prejudice in voting to convict Axton, and she clearly stated she could decide the case impartially. Accordingly, the superior court did not abuse its discretion by allowing G.M. to remain on the jury.

## C. The Testimony Given by the State's Witnesses Was Admitted Without Error.

**¶29** "Whether to preclude or limit a witness's testimony lies within the discretion of the trial court." *State v. Moody*, 208 Ariz. 424, 457, ¶ 135 (2004). When a witness's memory fails, Rule 612 permits the use of writing to refresh his or her memory while testifying. Ariz. R. Evid. 612. The court does not err by allowing a witness to read a document to themselves to answer a question posed during testimony. *See State v. Inman*, 2 CA-CR 2017-0199, 2018 WL 2276996, at *1, ¶ 5 (Ariz. App. May 18, 2018) (mem. decision).

**¶30** In his supplemental brief, Axton argues that all the State's witnesses were given scripts or notes, and seven of those witnesses improperly relied on those scripts or notes. Axton alleges that these witnesses either "[got] caught reading from scripts/notes/reports" or "[got] told to read from scripts/notes/reports." However, during the interactions that Axton cites, the record shows that the witnesses merely refreshed their memory by referring to documents when they were otherwise unable to recall a relevant fact. On several occasions, Axton's counsel interjected to request a witness refrain from reading directly from the documents and limiting their review to refresh their recollection. Aside from these requests to restrict consideration of documents to refresh a recollection, counsel offered no objections to the use of notes or reports. Because the witnesses' use of documents was limited to refreshing their memories, the superior court did not err by allowing the testimony.

**¶31** Additionally, Axton argues that witness A.N. testified falsely at trial. He argues that security footage admitted at trial contradicts her

testimony. However, the finder-of-fact, not the appellate court, weighs the evidence and determines the witnesses' credibility. *State v. Cid*, 181 Ariz. 496, 500 (App. 1995); *see also State v. Ortega*, 220 Ariz. 320, 330, ¶ 34 (App. 2008). The jury was presented with A.N.'s testimony and the security footage, and Axton's counsel had the opportunity to address any alleged inconsistencies. How much weight to give to A.N.'s testimony or whether it was credible are questions for the jury, and we will not reweigh the evidence on appeal.

## CONCLUSION

¶32        We affirm Axton's convictions and sentences.



AMY M. WOOD • Clerk of the Court
FILED:   AA