2020 IL App (2d) 170919-U
No. 2-17-0919
Order filed August 17, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14-CF-74 |
| CHRISTOPHER WHETSTONE, | ) ) | Honorable John A. Barsanti, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices McLaren and Bridges concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant was not denied a fair trial through jury bias, other-crimes evidence, ineffective representation, or prosecutorial misconduct.  Affirmed.

¶ 2    On January 13, 2014, Rachel Taylor died after being shot on a driveway near defendant's, Christopher Whetstone's, home in Aurora.  After a jury trial, defendant was convicted of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2016)) and sentenced to 60 years' imprisonment.

¶ 3    On appeal, defendant argues that he was deprived of his right to a fair and impartial trial for four overarching reasons: (1) jury irregularities and bias; (2) improper injection of other-crimes evidence; (3) ineffective assistance where his counsel failed to object to the introduction of dog-

tracking evidence; and (4) one of the prosecutors engaged in unprofessional conduct during closing arguments. For the following reasons, we affirm.

¶ 4                                             I. BACKGROUND

¶ 5     Defendant was charged with two counts of first-degree murder in connection with Taylor's death. Taylor was defendant's ex-girlfriend and the mother of his two children, who were in a vehicle in the driveway when their mother was killed.

¶ 6     Prior to trial, the court denied defendant's motion to transfer venue due to local publicity, subject to renewal after jury selection. The court also denied defendant's motion to suppress certain statements that he made upon arrest and while pending transport to the police station. Defendant's motion *in limine* to admit evidence of his theory of the case, namely, that Taylor was killed in a gang-related, drive-by shooting, was denied. However, the court granted defendant's motion *in limine* to bar reference to defendant's prior bad acts or convictions.

¶ 7                                    A. Jury Selection and Notes

¶ 8                                i. Questioning Regarding Racial Bias

¶ 9     During jury selection, one of defendant's attorneys asked a prospective juror about the diversity of the community in which that juror lived. After objection, counsel explained that the questions were intended to explore implicit racial bias. The court sustained the State's objection on the basis that race was not an issue in the case, given that defendant was African-American, and Taylor was white and African-American. Defense counsel noted that defendant was the only African-American person in the courtroom and further argued that studies show that implicit racial biases may impact how jurors hear evidence and consider guilt. The court stated that it would permit counsel to ask jurors if they would be biased against defendant because of his race, but that questions concerning diversity or where they grew up were "too far afield." Defense counsel asked

jurors if defendant's race would affect their deliberations, and they each responded in the negative. Similarly, counsel asked jurors if they thought that defendant was more likely to be guilty because he was African-American, and they all answered, "no."

¶ 10    During a break, defense counsel made a record of defendant's position concerning questioning jurors about potential racial bias.  Counsel explained that, according to research, everyone has *implicit* biases and that it was important to question more deeply whether the jurors would acknowledge those implicit biases and whether those biases would affect their deliberations. Counsel again noted that defendant was the only African-American in the courtroom at that point,[1] and that research showed that such biases could alter how a juror both heard evidence and considered guilt and innocence.  Counsel provided the court with an instruction that is purportedly used in California that defendant suggested should be read to the jury prior to hearing any evidence:

> "Each one of us has biases about or certain perceptions or stereotypes of other people.  We may be aware of some of our biases, though we may not share them with others.  We may not be fully aware of some of our other biases.
>
> Our biases often affect how we act, favorably or unfavorably, toward someone. Bias can affect our thoughts, how we remember, what we see and hear, whom we believe or disbelieve, and how we make important decisions.
>
> As jurors you are being asked to make very important decisions in this case. You must not let bias, prejudice, or public opinion influence your decision.  You must not be

---

[1] According to the State's argument on defendant's motion for a new trial, on the second day of jury selection, an African-American juror was selected to sit on the jury.

biased in favor of or against any party or witness because of his or her disability, gender, race, religion, ethnicity, sexual orientation, age, national origin, or socioeconomic status.

Your verdict must be based solely on the evidence presented. You must carefully evaluate the evidence and resist any urge to reach a verdict that is influenced by bias for or against any party or witness."[2]

¶ 11 The court rejected counsel's proposed instruction, noting that an African-American defendant is not constitutionally entitled to question prospective jurors about race. The court further noted, however, that it would permit some inquiry into whether a juror might be biased against defendant due to his race. Nevertheless, it would not allow *voir dire* to morph into indoctrination and extensive education on the topic. It further noted that it had not received any proposed questions that counsel would ask the venire, nor would it, at that point, allow any to be presented.

¶ 12 After jury selection, defense counsel again presented the court with the California instruction on implicit bias, requesting that it be read to the jury prior to hearing any evidence, as well as the supporting California canons of judicial ethics, which concerned a trial judge's obligation to conduct proceedings free from bias and prejudice (counsel noted that the Illinois Canons of Judicial Ethics had corollaries), and a 2016 resolution and report from the American Bar Association, advising that trial courts should advise juries about implicit bias and how it may

---

[2] Although the proposed instruction from California and other similar documents appear in the record, there are no official citations displayed on those documents, nor does defendant provide any in his briefs.

affect decisionmaking.[3] The court again rejected the request, but read instead to the jury Illinois Pattern Instruction, Criminal, No. 1.01 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 1.01), which it found sufficiently apprised the jury of its responsibility to be free from bias:

> "Neither sympathy nor prejudice should influence you. You should not be influenced by any person's race, color, religion, national ancestry, gender or sexual orientation." IPI Criminal 4th No. 1.01.

¶ 13                                b. Jury Notes

¶ 14    Over the course of jury selection and trial, the court received three notes from the jury. First, on the second morning of jury selection, the bailiff provided the court with a note from a juror that read:

> "I have a moral/philosophical issue with sentencing someone to death. I do not believe this is moral to do. I'm sorry, this was not covered yesterday and I realized this overnight. I do not know whether the sentencing in this case involved this issue. It was not covered. I thought it would have been."

---

[3] According to the document in the record, American Bar Association Resolution 116 states:

"The court should: 1) Instruct the jury on implicit bias and how such bias may impact the decision making process without the juror being aware of it; and 2) Encourage the jurors to resist making decisions based on personal likes or dislikes or gut feelings that may be based on attitudes towards race, national origin, gender, age, religious belief, income, occupation, disability, marital status, sexual orientation, gender identity, or gender expression."

¶ 15    Defense counsel agreed with the court that the entire panel that had so far been selected should be instructed that it was not to concern itself with punishment, that this was not a death-penalty case, and that the death penalty in Illinois was repealed. The State had no objection. The court instructed the eight chosen jurors:

> "You are not to concern yourself with the possible punishment or sentence for the offense charged during your deliberations. It is the function of the trial judge to determine the sentence, should there be a verdict of guilty; but I can tell you there is no death penalty in Illinois anymore. That was repealed years ago, so death is not an option, no matter what would happen. No matter what somebody could be convicted of, the death penalty is not an option as a punishment in Illinois anymore; so it's off the table."

¶ 16    Further, prior to hearing any evidence, the court again instructed the jury:

> "You are not to concern yourself with possible punishment or sentence for the offense charged during your deliberation. It is the function of the trial judge to determine the sentence, should there be a verdict of guilty."

¶ 17    After trial commenced, the court received a second note from the jury. This note concerned defendant's position in the courtroom when various exhibits were being displayed. Specifically, the court had allowed defendant to physically move to a position where he could see the evidence being displayed for the jury. The jury note read: "Difficult for jurors to take notes when defendant stands next to the jury." The court discussed the note with counsel. Apparently, defendant had been standing behind the jury, and defense counsel stated, "I interpret that they just don't want him behind so much that he can see their notes." Counsel questioned whether, if the concern was defendant seeing the jurors' notes, it might be better to position defendant in front of the jury. The State suggested placing a chair in front of the podium. Defense counsel stated that she would agree

to "the best suggestion that relieves any tension with the jurors." The court said it would try positioning defendant in front of the podium. It sent a note back to the jury stating simply that defendant would take a position in a different spot. Later, the jury sent the court a reply note stating: "your seat decision is agreeable by jury."

¶ 18     The next day, the court received a third note from the jury. The note read:

> "Jurors feel uncomfortable with defendant's family parking in lot along side of jurors. When walking to and from b[ui]ld[i]ng, they are walking in very close proximatey [*sic*] to many jurors, making eye contact also."

¶ 19     In response to this note, defense counsel filed a "motion for juror discharge or mistrial." Defendant noted, in part, that no jury foreman had been selected, and it was therefore unclear whether the person sending the notes to the court was communicating individual or group concerns. Defendant asked that the court conduct an inquiry to determine whether the concern communicated in the note was limited to one individual, or whether that individual had disseminated the feeling of threat or fear to others in the jury. If it was one individual, counsel requested that he or she be asked whether impartiality had been affected or if he or she had prejudged the case. If the issue had been discussed in the jury, counsel argued, then the risk was that the entire pool had been tainted and it showed that they failed to follow the court's initial instructions to refrain from discussing the case. The motion indicated that, depending on the result of the inquiry, defendant might request various remedies, including discharge of the single juror and/or a mistrial.

¶ 20     The court asked defense counsel to propose a procedure that might address the problem. After some discussion about a proper manner of inquiry that investigated the juror's thoughts without providing superfluous information that might actually serve to taint an otherwise-unaware

juror, the parties agreed that the court would question each juror individually in a general manner. Specifically, for each juror, the court asked, essentially, the following question (occasionally, with only minor variation):

"The Court has been made aware that a juror or a number of jurors were concerned about some contact. Now, I call it alleged contact because I wasn't there, I didn't see anything and I'm not sure exactly what happened, alleged contact between a juror or jurors and the defendant's family or supporters. Did you observe anything that made you concerned, that gave you some concern?"

Depending on the juror's response, the court engaged in follow-up questions, but always asked each juror whether he or she could continue to be fair to each side. The court admonished each juror that he or she should decide the case solely on the evidence and that he or she should not discuss the case, nor the court's inquiry, with the other jurors. The court did *not* ask any juror whether he or she wrote the note. All jurors stated that they were aware of the parking-lot situation, and that it had been discussed in the jury room, but none claimed to have seen anything involving contact or improper behavior, and no juror claimed to be concerned. One, alternate juror, stated only that "it gets maybe a little uncomfortable just because we're all in the same place, other than, you know, seeing everybody," but stated that he or she could "[a]bsolutely" remain fair and impartial, if he or she were to be seated on the jury. Indeed, all jurors stated that they could continue to be fair to each side.

¶ 21    In light of the jurors' responses, defense counsel stated: "[A]t this time, based on the inquiry of each juror questioned did say they could be fair and impartial and that they would follow the law as instructed by the Court, so at this time I'm not moving for discharge of any juror."

¶ 22    As follow up, the court also sent the jury a note:

"You are not required to park in any particular area. You are allowed to park anywhere you wish.

I have no authority to order any citizen to park or refrain from parking in any particular place.

If you feel threatened[,] inform the Bailiff and he will inform me.

If you wish to be escorted from the courthouse to your vehicle, I will make a deputy available. Inform the Bailiff if you wish to be escorted."

¶ 23                                                   B. Trial

¶ 24    As defendant does not raise a sufficiency argument on appeal, we depict only the evidence at trial that is relevant and gives context to his appellate arguments.

¶ 25    Defendant lived at 552 Charles Street in Aurora. Taylor and their two children lived there with him from October 2012 to September 2013. On January 13, 2014, Taylor bought a white Dodge Durango.

¶ 26                                        i. Occurrence Witnesses

¶ 27    Timothy Williams, defendant's half-brother, also lived at 552 Charles Street. He testified that, like many couples, defendant and Taylor argued. On January 13, 2014, Williams heard them arguing in the house, but could not hear their words. He asked them to "tone it down." Williams went upstairs and noticed defendant and Taylor outside behind Taylor's Durango. Later, the talking outside was louder, and Williams returned downstairs to tell defendant and Taylor to calm down before someone called the police. At that time, defendant and Taylor were still behind the Durango. He opened the door and gave them "a look," which quieted them down, and Williams returned upstairs. Williams later noticed that it was quiet outside; he came downstairs, opened the door, and a neighbor across the street said that someone had been shot.

¶ 28 Williams had not heard any gunshots, nor had he seen a gun in defendant's hands. Williams followed the neighbors and, about two houses down the street, he recognized Taylor lying face down in the lower part of the driveway. He heard someone calling 911. Williams tapped Taylor's shoulder, asked if she was alright, and turned her over to check for wounds. He saw two punctures in her skin, but did not see any bullets or cartridges near her. Williams yelled for someone to get a blanket and, once a blanket arrived, he returned to his home to put on warmer clothes. Williams did not see Taylor again.

¶ 29 That same night, at around 8:20 p.m., Abigail Galarza was leaving 549 Charles Street with her daughter. Galarza was taking her daughter to their car, a burgundy Nissan Altima, when she saw Taylor come out of the back seat, driver's side of the Durango, yelling for help and stating, "he shot me, he shot me." Taylor ran down the street, and Galarza saw a man, whom she later identified as defendant, get out of the same door of the Durango, wearing a "doo-rag," white hoodie, dark pants and, according to Galarza, carrying in his right hand a long-barrel gun. Defendant ran after Taylor. Galarza and her daughter got into the car, pulled out of the driveway, and drove away. She looked in her mirror and saw defendant and Taylor; she heard a gunshot and did not see any other vehicles in the area. Galarza telephoned her brother, an Aurora police officer, and went home.

¶ 30 Adrianna Saaverda lived at 556 Charles Street. Around 8 p.m. on January 13, 2014, she heard two people arguing. She recognized defendant, who was grabbing at Taylor as Taylor was pulling away. Taylor had a cell phone in her hand; she later saw Taylor pick it up, because it was broken. Saaverda alerted her daughter, daughter's boyfriend, and nephew, who were in the living room, and they all looked out of the window. According to Saaverda, Taylor was in the rear driver's side door of the vehicle, buckling up the children. Saaverda stopped looking for awhile,

but next saw Taylor's body on the ground. Saaverda explained that she did not hear a gunshot and would not say that defendant shot Taylor; only that defendant and Taylor were arguing.

¶ 31    Manuel Saenz lived with his family, including his son Misael, at 549 Charles Street (Galarza was at his house that evening). Manuel stopped at home briefly around 6:30-6:45 p.m. and saw defendant, whom he knew as "Mo," and Taylor. Misael said, "Damn it, what the hell's wrong with Mo fighting with his girlfriend." Manuel heard defendant say multiple times, "give me the goddamn phone," while he and Taylor struggled. Manuel testified over objection that he heard Taylor say, "I hate your fucking family" and "I hate you, I'm tired of you." Manuel and Misael left home. When they returned, there was an ambulance in the street and a crime scene set up. Manuel told police that defendant had been wearing a white hoodie and black leather jacket.

¶ 32    Misael testified that he and Manuel left home between 7 and 8 p.m. He knew defendant, defendant and Taylor were arguing, defendant was aggressively trying to grab something from Taylor, and defendant said, "give me your phone."

¶ 33    Lynette and C.J. Klimas lived at 541 Charles Street. Around 8:20 p.m., they were in their garage, when they heard a female voice yell for help and a gunshot. They ran outside, and Lynette told C.J. to call 911. C.J. did so, and stated that they saw a man wearing a gray hoodie running from the scene. He testified that the man in the hoodie wore dark jeans or pants and ran to the blue house (*i.e.*, defendant's house). Lynette testified that it was dark outside and that she saw a dark-colored car driving away, but she could not identify the car's make or model. C.J. said that the car was a black Nissan 350Z. Lynette testified that Taylor was laying in the driveway apron at 540 Charles Street (*i.e.*, a few doors down from defendant's house). She was comforting her, when a man in basketball shorts and a tee-shirt knelt down and rolled her over. There were two red spots in the area at the top of Taylor's stomach. Lynette got a blanket, and the man left.

¶ 34    Emergency technicians arrived around 8:30 p.m.  They cut Taylor's clothing and two gunshot wounds to her abdomen were visible, although they stated that there was no external bleeding.  The shirt Taylor was wearing, however, was produced at trial, and blood, powder, and soot are visible on it.  Taylor never regained consciousness and died during emergency surgery at Mercy Center Hospital.

¶ 35                              ii. Arrest and Investigation

¶ 36    Three officers from the Aurora Special Operations Group, Michael Corrigan, Christopher McWilliams, and David Tellner, were performing an undercover narcotics investigation when they heard a dispatch about a shooting on Charles Street.  The suspect was described as wearing a white hoodie, and it was further mentioned that a black Nissan might be involved.  As they headed to the scene, they encountered another shooting investigation taking place near Lake Street and a black Nissan.  They followed the Nissan, but asked another police vehicle to stop that car.  While watching the traffic stop, they saw a man walking nearby and wearing a white hoodie.  According to police, the man looked at the traffic stop, "opened his eyes wide," and started to jog away.  The officers followed the man, later determined to be defendant, and called for backup. They donned tactical vests, exited the van, and approached defendant with their weapons drawn.  They ordered defendant to the ground.  Defendant complied, saying "you got me, you got me."  After handcuffing defendant, they searched him; no weapons were found.  The officers testified that they recognized defendant from "prior police contacts."  Later, defense counsel objected to this reference, the court agreed that the reference should have been avoided, and it asked defense counsel for a proposed remedy.  Defense counsel proposed a curative instruction and stated that she would draft one.

¶ 37    While waiting at the arrest scene for witnesses Galarza and Saenz to arrive for show-up identifications, defendant asked officer Tellner for a cigarette because "it was going to be the last cigarette for awhile, I made a big mistake." In addition, defendant asked to speak specifically with Tellner. When he approached, defendant said, "my life is done, I made a big mistake," and "just tell me if he, she's okay." Defendant asked how "he or she was," and Tellner asked defendant who he was referring to. Defendant replied, "you know who" and eventually asked about Taylor. Defendant told Tellner that, when they saw him on the street, he had been on his way to his sister's house to turn himself in.

¶ 38    When defendant was getting into the transport van, another officer noticed what appeared to be blood stains on defendant's shirt. Those stains, and some found on his jacket, later tested positive for Taylor's DNA. Defendant sat on a bench in the transport van; the bench had no seatbelts, but contained straps that he could hold onto to prevent himself from falling. Defendant's hands later tested positive for gunshot residue.

¶ 39    A K-9 unit was called to 552 Charles Street. In sum, the officer and handler, Chris Sherwin, testified that the dog, Sabek, was a patrol narcotics dog, trained for narcotics tracking and apprehension. If the dog was tracking and a human was involved, Sabek would be released in order to apprehend the offender. Sabek was taken to where Taylor's body had lain. Sabek was allowed to pickup any odors, and he then tracked a scent to 552 Charles Street, defendant's home, first by tracking to the backyard and then alerting at the side door. Sabek was later taken to the arrest scene, and he did "reverse tracking" to follow a scent and in an attempt to find a weapon. However, no weapon was ever found.

¶ 40    The night of the shooting, police recovered from 552 Charles Street a .22-long rifle bullet (the same caliber of bullet found in Taylor's body) in the basement. Two days after the shooting,

two .22-caliber casings, one .40-caliber bullet, and an unfired cartridge were found on the ground near where Taylor's body had been lying in the driveway. Five days after the shooting, a .22-caliber cartridge was found on the floor of the back seat of the Durango. According to ballistics, the cartridge cases were fired from the same firearm.

¶ 41                                    iii. Autopsy

¶ 42    Dr. Mitra Kalelkar conducted Taylor's autopsy. Kalelkar testified that death was caused by multiple gunshot wounds. She removed two bullets from the body. The left abdomen wound had powder and soot around it, reflecting a close-range shot, fired from within approximately two feet of the body. Taylor had some abrasions on her hands.

¶ 43                                iv. Defendant's Case

¶ 44    Defendant did not testify. He produced an expert to challenge the testing and results of the gunshot residue and cartridge analyses. Another witness testified that, after the shooting, she was given permission to remove the children from the back of the Durango. Although she had a clear view of the floor, she did not see any metal objects (*i.e.*, cartridges) or anything similar there.

¶ 45    In addition, defendant's nephew, Michael Whetstone, testified as an expert in the Vice Lords street gang. At the time of trial, Michael was incarcerated as an armed habitual criminal. He had been a member of the street gang Vice Lords for decades and had been "shot at" multiple times, including from cars in drive-by, presumably gang-related, shootings. Defendant's home at 552 Charles Street had sustained bullet holes from a drive-by shooting in 2009. On January 13, 2014, Michael was on parole and was living at 552 Charles Street, but was not present that evening. He was "shocked" when he heard that Taylor had been shot. He thought that he was the intended target of the shooting.

¶ 46                                C. Jury Instructions

¶ 47    Prior to deliberating, the jury received numerous instructions, including again the instruction that, "Neither sympathy nor prejudice should influence you. You should not be influenced by any person's race, color, religion, national ancestry, gender or sexual orientation." IPI Criminal 4th No. 1.01.

¶ 48    In addition, in response to the officers' testimony that they knew defendant from prior contacts, the jury was instructed that "[t]he testimony of any witness that he or she knew the defendant from prior police contacts may not be considered by you in any way in arriving at your verdict."

¶ 49                            D. Posttrial

¶ 50    Defendant moved for a new trial or judgment *n.o.v.* At argument on the motion, with respect to jury bias and, specifically, the third juror note, defense counsel noted that, while she had no issue with the court's individual inquiries, it had never determined which juror had authored the note. Defense counsel argued that, although, upon the court's questioning, all jurors responded that they were not uncomfortable with anything that had happened in the parking lot, someone was not being truthful. "I would have made a motion to strike the individual juror who provided this note knowing that they were clearly bias[ed], clearly had some problem, and possibly because of race with the defendant's family being just in a public parking lot." Further, counsel reiterated that, because no one admitted to being uncomfortable, she did not, at that time, pursue a motion for mistrial based on the entire panel being biased; however, if the court had determined which juror wrote the note, she would have moved to strike that juror.

¶ 51    Further, although no contemporaneous objection was raised, counsel noted that one of the prosecutors engaged in improper and prejudicial conduct during the defense closing argument and during portions of the trial, specifically, rolling of eyes and laughing. In response, one of the

assistant State's Attorney's acknowledged feeling frustrated during the defense closing argument, as defense counsel's argument was lengthier than anticipated and he had a plane to catch, and that it was possible that he might have rolled his eyes. However, he asserted that neither he nor his co-counsel ever laughed. Defense counsel replied that she personally observed the behavior from his co-counsel, that it occurred during trial too, and that it included persistent laughing, rolling eyes, and throwing back of his head.

¶ 52 The court denied the motion for new trial or judgment *n.o.v.* In part, the court ruled that it found no evidence that the jury was prejudiced against defendant, it had decided not to explicitly ask the jurors who wrote the third note, and that it believed its rulings addressing the issue of potential bias remained correct. Further, the court ruled that the "prosecutors' conduct" was not so egregious or inflammatory as to cause the jury to be biased against defendant. The court sentenced defendant to a total of 60 years' imprisonment (35 years for the murder and 25 years for personally discharging the firearm that caused death). Defendant's motion to reconsider was also denied. He appeals.

¶ 53                                    II. ANALYSIS

¶ 54 Defendant argues that, whether considered singularly or cumulatively, multiple errors deprived him of a fair trial. He asks this court to address each in turn, but to also consider whether the errors, collectively, were of such gravity that the integrity of the judicial process was compromised. Defendant seeks reversal of his conviction and remand for a new trial.

¶ 55                                    A. Jury Bias

¶ 56 Defendant alleges that, for a myriad of reasons, he was deprived of his right to an impartial jury. He notes first that, pre-trial, his motion to transfer venue due to publicity was denied, and then his attempts to determine implicit bias during *voir dire*, through questioning and a proposed

non-IPI instruction, were thwarted. Jury irregularities followed, as reflected by the three notes submitted to the court.

¶ 57    With respect to the first note, defendant argues that, although the court instructed all of the then-selected jurors that there was no longer a death penalty in Illinois, the admonishment did nothing to establish whether: (1) the juror, who was apparently preoccupied with the idea of punishment, was presuming guilt and would be unable to examine the evidence at trial without the concept of punishment foremost in mind; (2) the juror's moral/philosophical dilemma was restricted to the death penalty; and/or (3) sitting judgment of another person, regardless of sentence, was the source of the dilemma.

¶ 58    As to the second note, defendant argues that the jurors' discomfort with defendant's physical position while viewing certain exhibits begs the question whether their feelings were based on an underlying belief that he was guilty. In addition, defendant asserts that this question connects to implicit bias, as the jurors might have implicitly believed that he was guilty because he is an African-American man. Defendant questions what possible concern or problem the jurors could have had with him standing near them, if they did not have a premature, underlying belief (by the second day of trial) that he was guilty. He disagrees that confidentiality of juror notes was truly of primary concern, as the notes presumably pertained only to evidence and, if not, would instead reflect that jurors were not performing their duties fairly and impartially by being attentive. Defendant maintains that "the reason the jurors did not want [him] standing near them was because of their implicit bias that, as an African-American man sitting in the defendant's chair and having been charged with this serious offense, he was a guilty man."

¶ 59    The third note, concerning where defendant's family parked in the parking lot is problematic, defendant argues, because, although the judge properly individually questioned each

juror to assess whether he or she remained impartial, at least one juror must have been untruthful to the court. Moreover, the questioning reflected that, although the judge admonished the jurors repeatedly not to do so, they clearly *were* discussing the case prior to deliberations. Although defense counsel could not proceed on the motion to discharge a juror, since no single juror admitted to experiencing or feeling that which was described in the note, defendant argues that his counsel's failure to pursue the motion for mistrial should be considered ineffective assistance. Defendant notes that, since it was impossible to strike the juror responsible for the note, the only reasonable action to take, based on the fact that someone on the jury must have been untruthful in his or her responses to the court, was to pursue the motion for mistrial. He argues that the failure to pursue the motion was unreasonable and that, given that at least one juror was untruthful, prejudice is established because there is a reasonable probability that the motion would have been granted.

¶ 60    Finally, defendant notes that the trial lasted three weeks and involved 40 witnesses, yet the jury deliberated only a mere two hours before convicting him. He asserts that this reflects that the jurors were either explicitly or implicitly biased, again noting that his counsel was not permitted to investigate during *voir dire* whether the jurors had experience with diverse populations and persons of another race. Defendant notes that, although the court allowed his counsel to make a narrow inquiry into whether the jurors would be prejudiced against him based upon his race, the permitted inquiry could provide insight into understanding only *explicit* bias, which completely defeated the purpose. Defendant asserts that studies have shown that the issue of explicit bias persists, but has become less prominent, while implicit biases are likely more pervasive and have "real-world" effects. He cites a law-review article that summarizes social scientists' empirical findings that there are negative implicit associations between African-Americans and weapons, a "shooter bias" against African-Americans, and stereotypes that African-Americans are violent and

criminal. These findings, defendant argues, are in addition to research concerning racial outgroups, *i.e.*, that jurors of one race tend to show bias against defendants who belong to another race. Further, defendant continues, research shows that the trial court's belief here—that *voir dire* on race was not necessary because race was not a central issue in the case—was inaccurate, as research shows that, when race is an issue in the case, jurors want to be fair and are more careful and thoughtful about race and their assumptions, but, in contrast, when the case is not racially charged, jurors are not vigilant about the possibility of racial bias influencing their decision making. Defendant argues that the color of his skin could have had grave consequences on how the evidence of his guilt was assessed. He notes that, in *Pena-Rodriguez v. Colorado*, __ U.S. ___, 137 S. Ct. 855 (2017), the Court explained that the judicial system has a duty, even after trial, to confront racial bias in the jury system to protect against a systemic loss of confidence in verdicts. *Id.*, __ U.S. at __, 137 S. Ct. at 868-69. Defendant contends that the failure to allow questions during *voir dire* and to use the proposed jury instruction and accompanying resolution prepared by the American Bar Association resulted in an unfair trial. Defendant concludes that all of the foregoing issues involving the jury reflect that he did not receive a fair trial before an impartial jury, and the gravity of these errors, coupled with defense counsel's failure to seek a mistrial when given the opportunity, should result in a reversal of his conviction and a remand for a new trial.

¶ 61 Defendant's arguments fall into three general categories: pre-trial (*voir dire* questioning and proposed instruction), the court's response to the three jury notes, and ineffective assistance. All categories concern bias and the right to a fair and impartial trial, a right that is protected by both the federal and state constitutions. See *People v. Bull*, 185 Ill. 2d 179, 214 (1998); see U.S. Const., amend. VI, XIV; Ill. Const. 1970, art. I, §§ 8, 13. We address each in turn.

¶ 62                     i. *Voir Dire* and Proposed Instruction

¶ 63    We first address defendant's points regarding pre-trial procedures. Initially, we emphasize that we do not take issue with the concepts defendant raises here, namely the existence, generally, of racial biases, including implicit ones, and the significant roles such biases may play. We acknowledge the judiciary's important responsibility to take seriously these unfortunate realities that may affect juror impartiality. We also do not necessarily disagree with defendant's point that, even in cases where race is not a central issue, racial biases may nevertheless be triggered, potentially requiring attention. However, the entire purpose of *voir dire* is to select an impartial jury. See *Duncan v. Peterson*, 408 Ill. App. 3d 911, 923 (2010). The trial court's management of that process, along with its decision to ask specific questions to prospective jurors, is reviewed for an abuse of discretion. *Id.* An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable. *People v. Lerma*, 2016 IL 118496, ¶ 23. Reversible error will be found only where the trial judge's conduct during *voir dire* thwarted the selection of an impartial jury. *Duncan*, 408 Ill. App. 3d at 923. Moreover, "it may be error for the court to fail to curtail *voir dire* that becomes an attempt to indoctrinate or pre[-]educate jurors or to obtain a pledge as to how they would decide under a given set of facts or determine which party they would favor in litigation." *Rub v. Consolidated Rail Corp.*, 331 Ill. App. 3d 692, 696 (2002).

¶ 64    Here, the court's decisions during *voir dire* were not unreasonable. Defendant relies heavily on *Pena-Rodriguez.* [4] Again, we have no quarrel, generally, with the principles enunciated

---

[4] The issue before the Court in *Pena-Rodriguez* concerned jury impeachment, and the facts were far more egregious than here, as they involved a juror who made clear statements during deliberations that reflected reliance on racial stereotypes and animus to convict the defendant. Specifically, the "alleged statements by a juror were egregious and unmistakable in their reliance

therein. However, that "the duty to confront racial animus in the justice system is not the legislature's alone" (*Pena-Rodriguez*, __ U.S. at ___, 137 S. Ct. at 867), and that there is a "sound basis to treat racial bias with added precaution" (*id.*, __U.S. at __,137 S. Ct. at 869) does not render the court's actions *here* an abuse of discretion. Indeed, as defendant acknowledges, the Court in *Pena-Rodriguez* also noted some of the difficulties that trial courts face in attempting to address racial bias with prospective jurors. Specifically:

> "this Court has noted the dilemma faced by trial court judges and counsel in deciding whether to explore potential racial bias at *voir dire*. [Citations.] Generic questions about juror impartiality may not expose specific attitudes or biases that can poison jury deliberations. Yet more pointed questions 'could well exacerbate whatever prejudice might exist without substantially aiding in exposing it.' " *Id.*, __ U.S. at ___, 137 S. Ct. at 869 (quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 195 (1981)).

¶ 65    Thus, mindful of that struggle, we conclude that the court here did not abuse its discretion. The court properly attempted to strike a balance, allowing questioning about racial bias, while mitigating against indoctrination or, essentially, overkill that could exacerbate the issue without necessarily illuminating jurors' implicit beliefs. Defendant's point that direct questioning about explicit bias may not be helpful, either because most jurors know the "correct" response to such blatant questions, is well-taken. Nevertheless, if, as defendant notes, implicit biases are sometimes not recognized by the holder of such biases, it is easy to see how juror questioning on implicit

---

on racial bias. Not only did juror H.C. deploy a dangerous racial stereotype to conclude petitioner was guilty and his alibi witness should not be believed, but he also encouraged other jurors to join him in convicting on that basis." *Id.*, __ U.S. at ___, 137 S. Ct. at 870.

biases may not be effective or might go so far as to become akin to cross-examination and backfire. Indeed, it remains unclear what questions defendant believes would have properly shed light on implicit bias. Other than the question aimed at exploring whether jurors had lived in racially-diverse communities, no offer of proof was made concerning the questions that defendant would have asked, and how those questions would have been effective on this issue.

¶ 66    As such, we conclude that the court's actions here were reasonable. The jurors were asked if they could be impartial to both sides. They were asked whether they believed that defendant, an African-American man was likely to be guilty, and whether his race would affect their deliberations. The court instructed the jury, before it heard any evidence, pursuant to IPI Criminal 4th No. 1.01, that "[n]either sympathy *nor prejudice* should influence you. You should *not* be influenced by any person's *race, color*, religion, national ancestry, gender or sexual orientation." (Emphases added). We note that the instruction is not qualified, such that it applies to both explicit and implicit biases. In addition, we see no abuse of discretion in the court's decision to utilize this IPI, as opposed to the proposed non-IPI instruction defendant proffered. "Approved pattern instructions are to be used generally, and may be modified or supplemented only when the facts of the particular case make them inadequate." *People v. Mitchell*, 129 Ill. App. 3d 189, 199 (1984). In contrast, "[a] non-IPI instruction should be given if a pattern instruction does not contain an accurate instruction on the subject the jury should be instructed upon ***." *People v. Sequoia Books, Inc.*, 160 Ill. App. 3d 750, 759 (1987). Frankly, the proposed non-IPI instruction, while lengthier, was unnecessary here, as the pattern instruction was both accurate and adequate. The court's exercise of discretion, allowing some questioning on racial bias and instructing the jury, both before hearing evidence and prior to deliberations, that it must not be influenced by prejudice or bias, was reasonable.

¶ 67                                    ii. Jury Notes

¶ 68     As summarized above, defendant raises arguments concerning all three jury notes, namely, that they allegedly-suggested bias against him and that the court utilized inadequate methods to address them.

¶ 69     Preliminarily, defendant offered no objection to the *processes* used by the court with respect to any of the notes, had input into the court's responses thereto, and, indeed, *agreed* with the court's approach each time. " 'An accused may not sit idly by and allow irregular proceedings to occur without objection and afterwards seek to reverse his conviction by reason of those same irregularities.' " *People v. Ramey*, 151 Ill. 2d 498, 522 (1992) (quoting *People v. Ford*, 19 Ill. 2d 466, 478-79 (1960)). "Where a party acquiesces in proceeding in a given manner, 'he is not in a position to claim he was prejudiced thereby.'" *People v. Hollahan*, 2019 IL App (3d) 150556, ¶ 17 (quoting *People v. Villarreal*, 198 Ill. 2d 209, 227 (2001)).

¶ 70     In any event, we recognize that receipt of three jury notes during a three-week trial might be uncommon. Still, we think it a stretch to call them "irregularities," and we further believe that defendant overstates their significance. Specifically, for a juror to question whether the death penalty is at issue and to be morally concerned about imposing that sentence simply does not translate to a presumption of guilt or an inability to remain impartial while evaluating evidence. The court alleviated the relevant concern by informing the entire seated jury not only that the death penalty was not at issue, but that it should not concern itself with punishment at all. We do not find an abuse of discretion the court's decision to not further explore the juror's hesitation, particularly where the juror was repeatedly reminded to be fair and impartial and where defense counsel, at the time, agreed with the court's approach.

¶ 71   The question concerning defendant's placement in the courtroom while the jury was trying to listen to evidence and take notes likely reflects nothing more than the obvious, *i.e.*, it is simply awkward and distracting to take notes with someone, particularly the accused, standing over one's shoulder.  Indeed, that is exactly how defense counsel interpreted the note when it was presented.  As such, the jury's note to the court reflects zealous recognition of its duty to remain attentive to the evidence, without undue distraction.  Counsel agreed that moving defendant to a different position, or any approach that would alleviate tension with the jury, was acceptable.

¶ 72   Similarly, the third note, regarding defendant's family in the parking lot, was handled reasonably.  We do not believe that the expressed discomfort necessarily reflects premature determination of guilt or racially-based animus.  Indeed, it is easy to imagine that, when one is sitting in judgment of another person's loved one, close, unsupervised, physical proximity to those family members might be uncomfortable, even without any conclusion of guilt, due to the inherently-great responsibility being borne.  Still, to err on the side of caution, the court properly granted defense counsel's request that it perform an individualized inquiry to ensure impartiality.  After inquiry, no juror had expressed an inability to remain impartial.

¶ 73   We find instructive *People v. Luellen*, 2019 IL App (1st) 172019.  Specifically, in circumstances that we view as more egregious than those here, a trial court received a note from the jury that read: "If the primary witness is so scared to testify that he dismissed the subpoena, what are the safety concerns for us?  We are concerned."  *Id.* ¶ 22.  The trial court noted, "It's not signed, it doesn't say which juror wrote this or how many jurors ascribe to this feeling, but this is what they wrote."  *Id.*  The court initially did *not* individually question the jurors; rather, it brought out the jury and explained that the information on juror cards is not shared with anyone, assured them of the "paramountcy of their safety," and asked them to raise their hands if they felt they

could not give both sides a fair trial. No hands were raised. *Id.* ¶ 24. A second note from the jury was received, however, expressing continued concern that, although the court maintained the juror cards, the defendant knew their names. The defendant's counsel asked that the jurors be questioned individually to determine whether he or she could give both sides a fair trial or, alternatively, for mistrial. The court questioned the jurors individually; only one juror responded that she was not sure if she could remain impartial. That juror was excused and the motion for mistrial was denied.

¶ 74 On appeal, the court affirmed. *Id.* ¶ 82. It held that the trial court did not abuse its discretion in either assessing possible juror bias or denying the mistrial, as: the court questioned the jurors individually; the court dismissed the only juror concerned about maintaining her impartiality; the remaining jurors were "well-instructed" not to arrive at conclusions until they heard all of the evidence; there was no reason to doubt that the remaining jurors could not keep an open mind; and nothing suggested that the jurors had pre-determined the merits. *Id.* ¶¶ 40-41. The court emphasized that, although the notes reflected discussion between jurors about a witness's fear of the defendant, the notes did not reflect discussion related to the defendant's guilt or innocence. *Id.* ¶ 42. In addition, the court had *repeatedly* instructed the jury not to deliberate before the completion of the evidence. *Id.* ¶ 44.

¶ 75 In *Luellen*, jurors directly expressed concern for their safety, whereas, here, the note expressed, at most, potential discomfort parking near defendant's family. Like *Luellen*, the note here did not reflect discussion related to guilt or innocence, and the trial judge properly questioned each juror to assess impartiality. The court was in the best position to evaluate the jurors' responses to that questioning. See, *e.g.*, *Bull*, 185 Ill. 2d at 202. Further, the court repeatedly instructed the jury that it was not to deliberate before completion of the evidence. Moreover, while we

understand defendant's point that no juror claimed to author the note, we think characterizing the responses as untruthful is too far a stretch. The court made a decision to not directly ask each juror whether he or she authored the note; the goal of inquiry was instead to assess overall jury bias and impartiality. Therefore, no juror necessarily lied. He or she might have been aware that close proximity to defendant's family could be uncomfortable, but nevertheless remained committed to fairly evaluating defendant's guilt or innocence based solely on the evidence. Similarly, there was never anything to suggest, either before trial or later upon questioning, that any juror was unable to perform his or her duties fairly and as instructed. Thus, given the record, which simply does not reflect that the jury was, in fact, prejudiced against defendant, we cannot find an abuse of discretion in the trial judge's approach to the third note, which defense counsel requested, and its determination that the jurors remained able to fairly evaluate the evidence. See *id.* at 202-03.

¶ 76                               iii. Ineffective-Assistance Claim

¶ 77     Finally, and related to our previous discussion, defendant raises an ineffective-assistance claim, arguing that, given the "irregularities" that occurred during *voir dire* with one selected juror or, later, with the whole panel, defense counsel should have pursued the motion for mistrial.

¶ 78     To establish a claim of ineffective assistance of counsel, a criminal defendant must establish deficiency and prejudice, namely: that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. See *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Bull*, 185 Ill. 2d at 203. If the ineffective-assistance claim can be disposed of on the ground that the defendant did not suffer prejudice, we need not determine whether counsel's performance was deficient. *Id.*

¶ 79    In *Bull*, the defendant's ineffective-assistance claim failed on the prejudice-prong, because he could not establish that, despite his counsel's challenged conduct, the jury was actually prejudiced against him. *Id.* 203-04. Here, too, defendant fails to establish that the jury was prejudiced against him. We do not agree with his presumption that, if pursued, the motion for mistrial would likely have been granted. A trial court should grant a mistrial "where an error of such gravity has occurred that it has infected the fundamental fairness of the trial, such that continuation of the proceeding would defeat the ends of justice." *People v. Bishop*, 218 Ill. 2d 232, 251 (2006). We review for an abuse of discretion the court's decision, as well as its determination whether the trial has been infected such that it is fundamentally unfair. *Id.*; *Luellon*, 2019 IL App (1st) 172019, ¶ 36. In this instance, the trial court would *not* likely have granted a motion for mistrial, as individual questioning did not reflect that any juror's impartiality had been compromised. Again, no juror necessarily lied, and, after inquiry, the court reasonably remained confident that the jurors would fairly evaluate defendant's guilt or innocence based solely on the evidence. As defendant's motion for mistrial would not likely have been granted, nor has he shown that the jury was actually prejudiced against him, his ineffective-assistance claim fails.

¶ 80                            iv. Jury Bias - Conclusion

¶ 81    In sum, our judicial system is not infallible: "perfection in trial procedure is virtually unattainable" and, thus, it is fundamental that a defendant in a criminal case is "entitled to a fair trial, not a perfect one." *Bull*, 185 Ill. 2d at 214. The determination of whether a jury has been "irrecoverably compromised by interjuror communications," as well as the initial decision about whether and how to ask jurors about possible bias, rests in the trial court's sound judicial discretion." *Luellen*, 2019 IL App (1st) 172019, ¶ 36. The law requires simply that "a juror will be able to set aside all information he [or she] has acquired outside the courtroom, along with any

opinions he [or she] has formed, and decide the case strictly on the evidence as presented in the courtroom." *People v. Taylor*, 101 Ill. 2d 377, 386 (1984). Nothing here suggests that, alone or collectively, the issues defendant raises compromised the jurors' ability to decide the case fairly. As defendant notes, "*voir dire* at the outset of trial, observation of juror demeanor and conduct during trial, juror reports before the verdict, and nonjuror evidence after trial are important mechanisms for discovering bias," (*Pena-Rodriguez*, __ U.S. __, 137 S. Ct. at 868); however, those circumstances in this case do not suggest jury bias against defendant, or that it decided the case on anything other than the evidence. We do not agree with defendant that the two-hour deliberation period reflected bias, as the evidence against defendant was, for the reasons discussed later in this decision, overwhelming. Accordingly, defendant has not demonstrated that the jury-related issues deprived him of a fair trial.

¶ 82                                    B. Suggestion of Other Crimes

¶ 83    Defendant next raises the argument that other-crimes evidence was improperly injected into the trial. Specifically, he notes that his motion *in limine* to exclude evidence of other crimes was granted (with a minor exception not relevant here). Nevertheless, various police officers testified that, on January 13, 2014, they recognized defendant from "prior contacts." In addition, various officers testified that they dealt with narcotics investigation and, further, the evidence reflected that Sabek was a "patrol narcotics dog which meant that he was able to search for narcotics, track and apprehension." Together, defendant argues, the references to prior contacts and the notion that narcotics were somehow involved in the case, prejudiced him and violated the court's order. Further, he notes, although the court provided the jury with a limiting instruction, the damage was too great and had already been done.

¶ 84    Defendant objected to introduction of other crimes before trial, and, at trial, his counsel requested a limiting instruction pertaining to the "prior contacts." Counsel did not, apparently, object to the "narcotics" references, and it appears that defendant argues that these errors, collectively, require reversal under the second-prong of the plain error rule. For the following reasons, under we conclude that his argument fails.

¶ 85    First, we are not convinced that error occurred here. The evidence defendant points to reflects the officers' explanation that, when they heard the dispatch call about the shooting, they were already in the area conducting a narcotics investigation. Similarly, reference to the patrol dog being trained to search for narcotics was mentioned *along* with the fact that the dog was trained to track and apprehend. No one ever testified or implied that defendant was involved with narcotics or that the dog was, in this case, tracking narcotics. Thus, the references were contextual and not directly linked to defendant personally.

¶ 86    Further, that officers mentioned knowing defendant from "prior contacts" was not entirely irrelevant. Defendant apparently requested specifically to speak with officer Tellner, and that officers knew defendant from prior contacts provided context to explain that request. Moreover, to the extent that error occurred on this point, defense counsel objected, and the trial court, upon defense counsel's *request*, provided the jury with a limiting instruction that "[t]he testimony of any witness that he or she knew the defendant from prior police contacts may not be considered by you in anyway in arriving at your verdict." Again, one may not sit back and allow error, then seek reversal based on that alleged error. See, *e.g.*, *Ramey*, 151 Ill. 2d at 522. Further, we have no reason to suspect that the jury did not follow this instruction and, thus, defendant did not suffer prejudice. See *People v. Taylor*, 166 Ill. 2d 414, 438 (1995) ("The jury is presumed to follow the instructions that the court gives it").

¶ 87    Further, to the extent that counsel did *not* properly object or preserve the issue, defendant's plain-error argument fails.  Plain error allows a criminal defendant to obtain appellate review of procedurally-forfeited errors that occurred at trial.  *People v. Rinehart*, 2012 IL 111719, ¶ 15; see Ill. Sup. Ct. R. 615(a) (eff. Jan. 1, 1967).  Plain error is invoked only where the evidence is closely balanced (prong one), or the alleged error is so substantial that it deprived the defendant of a fair trial (prong two).  *People v. Hampton*, 149 Ill. 2d 71, 100 (1992).  In this appeal, defendant asserts only prong-two error.  Both prongs of plain error require an initial determination that error occurred (*People v. Glasper*, 234 Ill. 2d 173, 203-04 (2009)) and, therefore, defendant's claim fails because, for the reasons stated above, we find no error.

¶ 88    Even if we were to accept defendant's claim of error, not every trial error qualifies as the "substantial" error required for prong two to apply.  Specifically, "[w]here the defendant claims second-prong plain error, a reviewing court must decide whether the defendant has shown that the error was so serious it affected the fairness of the trial and challenged the integrity of the judicial process."  *People v. Sebby*, 2017 IL 119445, ¶ 50; see also *People v. Clark*, 2016 IL 118845, ¶ 42. The mention of prior contacts and narcotics here was not substantial, such that it affected the fairness of trial or challenged the integrity of the process.  Thus, defendant's second-prong plain error claim fails.

¶ 89                          C. Improper Use of K-9 Evidence

¶ 90    Defendant argues that his defense team was ineffective where it failed to seek exclusion of testimony regarding the dog tracking.  Defendant notes that counsel never objected to any of the testimony about Sabek tracking a person or a person's route, despite the prevailing caselaw at the time, namely *People v. Cruz*, 162 Ill. 2d 314, 369-70 (1994), that dog-tracking evidence is inadmissible in Illinois.  Defendant argues that his team should have either moved to preclude or

objected to the prejudicial references to Sabek being a "narcotics" trained tracking dog, as well as the unreliable and prejudicial evidence. He argues that counsels' failures in this regard, and failure to include the issue in the posttrial motion, constituted ineffective assistance that, coupled with the additional issues raised on appeal, deprived him of his constitutional right to a fair and impartial trial. We disagree.

¶ 91    Again, to establish his ineffective-assistance claim, defendant must show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Bull*, 185 Ill. 2d at 203. If the ineffective-assistance claim can be disposed of on the ground that the defendant did not suffer prejudice, we need not determine whether counsel's performance was deficient. *Id.*

¶ 92    It is true that *Cruz* reiterated that "testimony as to the trailing of either a man or an animal by a blood-hound should never be admitted in evidence in any case." *Cruz*, 162 Ill. 2d at 368. Moreover, this court recognized that *Cruz* "unambiguously announced a broad and clear prohibition of 'bloodhound evidence' presented to *prove any factual proposition* in a criminal proceeding ***." *People v. Montano*, 2017 IL App (2d) 140326, ¶ 95. Frankly, we remain puzzled as to why the dog evidence was presented here at all, if not to imply that defendant fled Taylor's body and ran back to his house before he was ultimately arrested, which it certainly did not establish. That Sabek would track from the place where Taylor was found back to defendant's house proved nothing, as Williams plainly testified that he came from the home to comfort Taylor, he turned her over and inspected her wounds, and then he returned to defendant's home. Sabek could have picked up Williams' scent, or even Taylor's scent from when she was in defendant's

house earlier that evening. Nor did Sabek find a weapon in his initial or reverse tracking. Simply put, the evidence was utterly unpersuasive on any topic and should not have been introduced.

¶ 93    For this same reason, however, we cannot find the prejudice required to sustain defendant's ineffective-assistance claim. Even if the evidence was inadmissible and counsel's failure to object constituted deficient performance, nothing about the evidence suggests that, but for counsel's error, the result of the trial would have been different. Indeed, the evidence of defendant's guilt was overwhelming. More specifically, to the extent that Sabek in any way suggested that defendant was present at the scene, *numerous* eyewitnesses had already placed him there. Further, defendant was apprehended wearing the clothes described by witnesses, and his comments to the officers that he made a mistake, asking if Taylor was all right, and claiming that he was on his way to turn himself in, also supported the inference that he had been present at the scene. Moreover, gunshot residue was found on defendant's hands, and the bloodstains on his clothes tested positive for Taylor's DNA. In short, counsel's failure to object to the use of canine evidence does not undermine our confidence in the outcome. Defendant's ineffective-assistance claim fails.

¶ 94                              D. Prosecutorial Misconduct

¶ 95    Finally, defendant argues that, in an already-damaged prosecution, one of the prosecutors put the "icing on the cake" when he engaged in childish behavior during closing arguments. Specifically, according to defendant, the assistant State's Attorney persisted, in front of the entire courtroom, in laughing, throwing back his head, and rolling his eyes. Although defendant did not raise a contemporaneous objection, he notes that he argued it posttrial and the court ruled that the conduct was not so egregious as to cause the jury to be biased. Defendant alleges that, setting aside forfeiture, this argument should simply be considered as part and parcel of his overall argument that the integrity of this judicial process was compromised and that he was denied his

constitutional right to a fair trial. Defendant maintains that, even if, alone, the conduct was insufficient to cause jury bias, it disparaged the defense attorney and defense theory and should be "most vigorously condemned by this court."

¶ 96 We cannot conclude that this error is reversible. Again, as there was no contemporaneous objection, and defendant raises only second-prong plain error, we cannot conclude, in the context of the entire three-week trial, that this alleged error was so substantial that it challenged the fairness of trial overall or the integrity of the judicial process. See *Sebby*, 2017 IL 119445, ¶ 50.

¶ 97 Clearly, however, comments or behavior that disparage the integrity of defense counsel are totally improper and cannot be condoned. See, *e.g.*, *People v. Starks*, 116 Ill. App. 3d 384, 394 (1983). Although the State is correct that the record is not extensive on this topic, it suffices to suggest that at least some improper conduct occurred, as the trial court ruled that it was insufficient to bias the jury, not that it did not happen. As requested, we vigorously condemn the behavior described here, and we remind the State that it is held to a very high standard of conduct and has an obligation to uphold the integrity of the criminal justice system.

¶ 98                                    E. Cumulative Error

¶ 99 Defendant asserts throughout his brief that the alleged errors, together, warrant reversal under the second-prong of plain-error review. He argues he did not, overall, receive a fair trial, when one considers the irregularities regarding the jury (*voir dire*, notes, instructions, etc.), the improper evidence of prior contacts, the wholly inadmissible evidence of dog tracking, and the prosecutorial misconduct.

¶ 100 Although not specifically developed as such, defendant's argument sounds like a plain-error argument premised on cumulative error. Generally:

" '[W]here errors are not individually considered sufficiently egregious for an appellate court to grant the defendant a new trial, but the errors, nevertheless, create a pervasive pattern of unfair prejudice to the defendant's case, a new trial may be granted on the ground of cumulative error.' [Citation.] 'However, the cumulative errors that warrant such an extreme result must themselves be extreme.' [Citation.] 'There generally is no cumulative error where the alleged errors do not amount to reversible error on any individual issue.' " [Citation.] *People v. Sims*, 2019 IL App (3d) 170417, ¶ 55 (2019).

¶ 101    Here, defendant's appellate arguments are not unreasonable, but most of them are not error, and none amounts to reversible error. The record does not reflect any unfair prejudice to defendant's case. As such, they do not, cumulatively, require a new trial. To the extent that the plain-error argument is premised on cumulative error, therefore, it must fail.

¶ 102                                    III. CONCLUSION

¶ 103    For the reasons stated, the judgment of the circuit court of Kane County is affirmed.

¶ 104    Affirmed.