NOTICE

Decision filed 05/20/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250314-U

NO. 5-25-0314

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 07-CF-968 |
| | ) | |
| BOBBY TATUM, | ) | Honorable |
| | ) | Randall B. Rosenbaum, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Presiding Justice Cates and Justice McHaney concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court did not err in denying defendant's motion for leave to file his sixth successive postconviction petition. Because no argument to the contrary would have arguable merit, defendant's appellate counsel is granted leave to withdraw, and the judgment of the trial court is affirmed.

¶ 2   Defendant, Bobby Tatum, is serving a sentence of 24 years in prison after being convicted in 2007 of the offense of aggravated battery of a child, a Class X felony. On March 25, 2025, he filed a motion for leave to file his sixth successive postconviction petition. The trial court denied the motion, and defendant appealed from the denial. The Office of the State Appellate Defender (OSAD) was appointed as his appellate counsel. OSAD has concluded that this appeal lacks arguable merit and, on that basis, has filed a motion for leave to withdraw as counsel, pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), along with a supporting memorandum of law. OSAD

1

properly served defendant with notice. This court gave defendant the opportunity to file a response to OSAD's motion. Defendant has filed responses. Having reviewed OSAD's *Finley* motion and memorandum, defendant's responses, and having examined the entire record on appeal, this court agrees with OSAD's assessment of this appeal.

¶ 3                                            I. BACKGROUND

¶ 4     On June 28, 2007, defendant was indicted on two counts of aggravated battery of a child, a Class X felony. Both counts alleged that between March 1, 2007, and April 21, 2007, defendant, who was over the age of 18, hit S.D. (the minor), who was under the age of 13, "about the back and body with a[n] electric cord." Count I alleged defendant's actions "knowingly caused great bodily harm to" the minor, while count II alleged defendant's actions "knowingly caused permanent disfigurement to" the minor. The case proceeded to a jury trial that began on August 29, 2007. The State moved at the outset of the trial to dismiss count II, and to proceed only on count I.

¶ 5     During *voir dire*, the prospective jurors were informed of the charge against defendant, and were instructed that defendant was presumed to be innocent, a presumption that remained with defendant "throughout the case and" that would not be "overcome unless from all the evidence you are convinced beyond a reasonable doubt that the Defendant is guilty." The prospective jurors also were informed that the burden of proving defendant guilty beyond a reasonable doubt was "on the State, and that burden never shifts." They were informed that defendant was "not required to present evidence or prove his innocence," was not required to testify, and that if he chose not to testify, that fact could not be considered by the jury.

¶ 6     The prospective jurors were informed that the trial court would instruct them on the applicable law, and that they would be required to follow the court's instructions "even if [they]

personally disagree[d] with some of them." They were told that the trial court sought "fair and impartial jurors who will be free of sympathy or prejudice and will keep an open mind throughout the case," and that they "must not speculate about what may have happened outside the facts presented at trial." The prospective jurors were informed that they must reach their decision only after hearing all the evidence, and "must make that decision with no feeling for or against either side."

¶ 7 The prospective jurors were then sworn and questioned. None of the prospective jurors who eventually served on defendant's jury indicated any biases, preferences, beliefs, experiences, or anything else that they believed would impact their ability to judge the case fairly. Likewise, all of the prospective jurors who eventually served on the jury indicated that they agreed that (1) before defendant could be convicted, the State was required to prove him guilty beyond a reasonable doubt, (2) defendant was presumed innocent, (3) defendant was not required to present evidence, and (4) if defendant chose not to testify, that choice could not be held against him. All of the prospective jurors who eventually served on the jury also indicated that they would follow the instructions of law, even if they did not "personally agree with all of those instructions."

¶ 8 Following the empaneling of the jury, the trial court stated that it wished to make a record of the fact that although one prospective juror had been "disruptive," that prospective juror's "name was never reached on the list," and that therefore "it was not a necessity that we skip over her. We just never reached her." Following opening statements, the State began to present its case.

¶ 9 Of relevance to this appeal, Latasha Seets testified that she was 30 years old and disabled. She testified that the minor was her seven-year-old nephew, and that in the past, she sometimes had provided childcare and transportation for the minor. She testified that defendant, whom she identified in court, was her sister's boyfriend and had lived with the minor since February 28,

2007. Seets testified that in "the middle of April" of 2007, she went to the minor's home to recover a video game memory card the minor allegedly had stolen from Seets's 14-year-old son. She testified that defendant handed her the memory card, then she "spanked" the minor "a couple of times across the behind" with her son's belt. She testified that prior to spanking the minor, she told him that stealing was wrong and that he could end up in jail for stealing. She testified that she spanked the minor over his clothes, and without much force, "slightly tapp[ing] across his butt." She testified that he did not scream or yell, but "sobbed."

¶ 10    Seets testified that the following week, she did not take the minor to school as usual. She testified that she next saw the minor one week after the spanking, on Friday, April 20, 2007. Seets testified that she took the minor and his mother and brother to Seets's home that day, and that at her home, she observed injuries on the minor's back. Seets testified that the bruises and other injuries seen in photographs admitted into evidence by the State were the bruises and injuries she observed personally, and that she did not cause them. She denied that she hit the minor with an extension cord. She agreed that the injuries were located on the minor's hands, arms, side, upper back, lower back, upper hip, and upper legs.

¶ 11    Seets testified that when she saw the injuries, she "freaked out." She testified that she informed the police of the injuries the following day. She testified that she admitted to police that she hit the minor with a belt, and that although she was later arrested for that, the charges were dropped. Seets testified that she was testifying truthfully and of her own free will. She further testified that she did not "have any personal beef against" defendant. On cross-examination, Seets testified that she waited a day to call the police because she expected her "sister to step up to be a parent to call the police herself."

4

¶ 12    The minor testified that he remembered the day Seets came to his home to retrieve the memory card. He testified that she was "angry" at him and that she "whupped" him with a belt. He testified that Seets hit him "[t]wo times" with the belt on his "behind," and that he yelled because "it hurt some." He testified that Seets stopped after hitting him two times, and again testified that she did not hit him more times than that. When asked if anyone else hit him that day, the minor answered, "Bobby," which we note is defendant's first name. The minor testified that after Seets left the home, Bobby hit him with a "switching cord." When asked how many times Bobby hit him, the minor testified, "Like a lot." He identified himself in the previously-admitted photographs and testified that the injuries came from Bobby, not Seets. The minor testified that his mother "screamed" at Bobby after coming home and seeing the injuries. He testified that Bobby kept him home from school for the next week. On cross-examination, the minor again testified that after Seets hit him with the belt and left the home, Bobby "whupped" him. He agreed that when the police came to his home, he first told them that Seets, not Bobby, caused his injuries. He further agreed that when he was interviewed again by police, he first told them the same thing.

¶ 13    Officer Daniel Ward testified that he had been employed by the city of Champaign as a police officer for three years. He testified that he responded to a call that a child was being abused, and that "[t]he dispatcher advised that [Seets] had called to report that [defendant] was there and had whipped the boy." Officer Ward testified that he helped the minor lift his shirt so that he could observe the injuries. He testified that there were many injuries, and that "[t]he impact point was in the shape of a 'u.' " He added that the injuries "were all consistent with the same size and it appeared that a flexible object had been folded over itself and that's what he had been struck with." Officer Ward testified that the injuries were consistent with being struck with an extension cord, not a belt, because "[a] belt is thick." He added, "Usually when a belt is struck and hits a person it

5

leaves a mark the width of the belt. This was much thinner." He testified that he observed several extension cords in the living room, including "a thick extension cord for exterior, outside *** that was consistent with the *** marks on [the minor's] back." He testified that he did not seize any of the extension cords. Officer Ward testified that the minor told him that Seets caused the injuries, and that the minor denied that defendant caused them. On cross-examination, Officer Ward agreed that both times he interviewed the minor on April 21, 2007, the minor said that Seets, not defendant, caused the injuries. He agreed that defendant was in the home, but was not "standing right next to" the minor when Officer Ward questioned the minor.

¶ 14 Detective Dale Rawdin testified that he had been employed by the Champaign Police Department for almost 13 years. He testified that he interviewed Seets three times during his investigation. He testified that in the first interview, Seets did not tell him that she had hit the minor. Detective Rawdin testified that in the second interview, Seets denied hitting the minor. He testified that in the third interview, Seets admitted "she had initially been untruthful," and "that she had, in fact, spanked the child three times with a belt." He testified that he did not threaten Seets or promise her anything, and that she made the statement voluntarily.

¶ 15 Detective Mark Huckstep testified that he had been employed by the Champaign Police Department for 16 years. He testified as to his specialized training in conducting forensic interviews of juveniles, and that he interviewed the minor in this case. He testified about the ways in which he tried to make the minor feel comfortable when interviewing the minor at the Child Advocacy Center in Urbana. Detective Huckstep testified that the interview took place on April 25, 2007, and that it was video and audio taped. He authenticated a CD disc that contained a recording of the interview, and also authenticated a transcript of the interview, both of which were

admitted into evidence. Copies of the transcript were given to the jurors so that they could read along as the recording of the interview was played.

¶ 16    In the interview, the minor first stated that Seets "[w]hooped" him with an extension cord. He thereafter stated that both Seets and defendant "whipped" him. The minor later stated that first Seets "whooped" him, then defendant "whooped [him] with an extension cord." The minor also stated that defendant hit him "a lot of times," and "threw [him] on the ground." The minor stated that defendant stepped on the minor's head, and hit the minor with his hand. He stated that his mother was mad at defendant for hurting the minor's back. He reiterated that defendant hit him "[a] lot of times." On cross-examination, Detective Huckstep agreed that the minor's narrative shifted at times throughout the interview and was not always easy to follow.

¶ 17    The State rested, and following the denial of his motions for a directed verdict, defendant chose not to present any evidence. Following closing arguments, the trial court instructed the jury. Among other things, the trial court told the jury that "[n]either sympathy nor prejudice should influence" them, and that they "should not be influenced by any person's race, color, religion, or national ancestry." After deliberating for approximately 40 minutes, the jury found defendant guilty of aggravated battery of a child.

¶ 18    On September 19, 2007, approximately two and a half weeks after the trial concluded, the trial court notified defendant's counsel, and the State, by letter that the trial court had received "correspondence" concerning the case, which the trial court was placing in the court file. The trial court's letter also stated that copies of the correspondence were enclosed with the trial court's letter. The correspondence found in the record on appeal consists of a two-page typewritten letter (letter) dated September 17, 2007, purportedly from one of the jurors, who identified himself as John Gergely. The full substantive content of the letter is as follows:

7

"Thank you for your courteous letter recognizing my jury service during the trial and conviction of [defendant] for aggravated battery of a child. While I appreciate the gesture and am eager to respond, I must reject your inferences that I and my fellow jurors 'devoted [our] full diligence and effort' or that the so-called justice system that we participated in 'protects all of our rights' or is in any way a well-functioning social institution.

I approached my jury service with abstract skepticism about the criminal justice system. Nonetheless, I chose to act as a credulous participant, and indeed I capitulated with the decision to convict [defendant] and send him to jail. This certainly implicates me in the critique that follows, but my experience during this trial also vividly exemplifies that critique and makes it not at all abstract.

At the outset, I would reject the claim that [defendant] was tried by a jury of his peers. I believe that most jurors were expecting to find the defendant guilty from the moment they heard the charge. I believe that many jurors were unable to understand aspects of the case (and hence interpreted these aspects as signs of the defendant's guilt) because the jurors do not share the cultural background or economic status of the persons involved in the case, including the defendant.

I believe that the evidence presented in court precluded any chance that [defendant] would receive a fair trial. In particular, I do not understand how photographs of the victim's injuries are relevant to the guilt or innocence of [defendant], and I do not understand why you allowed them as evidence. The defense did not dispute the fact of the injuries the victim received, only the person responsible for inflicting them. However, the racist structure of the criminal justice system and of our own culture teaches us to expect that a black man is responsible for a violent crime. It was apparent to me that many jurors were prepared to convict [defendant] based largely on the photographs of the defendant's [*sic*] injuries, which in no way denote [defendant's] guilt or innocence. It is impossible to imagine how the presence of those photographs during deliberations could do anything *but* predispose the jury to find [defendant] guilty.

I was also dismayed by the fact that the public defender did almost nothing to challenge the account and interpretation of evidence given by the prosecutor. Given inconsistent testimony and two pieces of circumstantial evidence, it is not hard to come up with alternative scenarios that would furnish a reasonable doubt of the defendant's guilt. However, the defense did not offer any such scenarios and did not do enough to challenge the shaky evidence on which the prosecutor's case was built. I hope that the quality of counsel the defendant received will be considered during any appeals.

Finally, I don't believe the jury did its duty to find the defendant guilty *beyond a reasonable doubt*. Although most jurors immediately expressed certainty of the defendant's guilt, I asked them to consider carefully whether or not the standard of guilt beyond a reasonable doubt was met, to which I received mostly shrugs. Most jurors spent their time during deliberations cracking jokes about the drudgery of jury service, condemning the family involved in this case for irresponsibility and poor parenting (again, racism is not an isolated problem in this context but a systemic characteristic of the criminal justice process), or speculating on aspects of the case that were clearly beyond the bounds of evidence the jury was instructed to consider. I cannot regard that as an example of a diligent jury or of justice served.

8

From this experience, I believe that the basic flaw of this system is that it is not predicated on a community, that we are not peers of the defendant, [the] victim, or [the] witnesses in any meaningful sense. You and I and the other jurors can decide to send someone to jail, destroying his livelihood and a large portion of his life, without experiencing any consequences of that decision. This is after the victim and others involved in this case have been subjected to the humiliation and trauma of police interrogations, testifying in court, and the state-sanctioned dismantling of a family. It is impossible to claim that sending another person to jail, regardless of his guilt or innocence, can in any way remedy these injuries. But you and I and the other jurors are not required to defend our actions or explain how they are just or appropriate. We can afford to judge the situation without care and decide a person's fate without consequence to ourselves, and we did so. By exercising these privileges, we show that we are not peers of the defendant.

I thank you for your time and consideration in reading this, I am quite sincere in writing it. If you have not yet sentenced [defendant], I hope you will bear in mind my account of the problems with this trial and choose to mitigate his sentence to the fullest extent possible. If you have already sentenced him or when you do, I would appreciate knowing the outcome. I am also interested in doing anything I can to aid [defendant's] appeal. Please let me know if you can advise me about how to be involved in that process." (Emphases in original.)

¶ 19 Defense counsel did not raise the letter in the amended posttrial motion he thereafter filed, in the addendum to that motion, or at the hearing on those motions. Defendant also did not raise the letter in any of the following proceedings: (1) his direct appeal from his conviction and sentence, (2) his initial postconviction petition, or (3) multiple additional collateral attacks on his conviction and sentence.

¶ 20 On November 4, 2019, defendant filed a *pro se* motion for leave to file a successive postconviction petition. Therein, he claimed he received ineffective assistance of counsel because his trial counsel had a *per se* conflict of interest. One of the exhibits listed by defendant as supporting his claim was the letter, which defendant claimed "stated that black people are known to [commit] violent crimes which is now improper for a jury/juror racial bias stereotype; which violated [defendant's] rights to [a] fair jury trial due process of law." Defendant argued, as "cause" for failing to bring a claim regarding the letter sooner, that at the time of his previous filings, a jury

9

verdict could not be impeached for "racial bias." He claimed that the letter demonstrated that "racial bias animus was a significant motivating factor in" his conviction.

¶ 21    On March 30, 2020, the trial court denied defendant's motion for leave to file a successive postconviction petition. The trial court focused on refuting defendant's claim of a *per se* conflict of interest on the part of his trial counsel, and did not mention the letter, or any potential claim related to the letter, at all. On appeal, defendant did not raise a claim concerning the letter. *People v. Tatum*, 2021 IL App (4th) 200206-U, ¶ 18. This court affirmed the circuit court's judgment. *Id.* ¶ 3. We held that the factual basis for defendant's *per se* conflict of interest claim was reasonably available to him, and that defendant did not identify any objective factor that prevented him from obtaining information related to his claim before he filed his initial postconviction petition. *Id.* ¶ 23. Accordingly, we found that defendant did not make a *prima facie* showing of cause, and that the denial of his motion for leave to file a successive postconviction petition was proper. *Id.*

¶ 22    On February 3, 2025, defendant filed an additional *pro se* motion for leave to file a successive postconviction petition, this time raising a claim concerning trial counsel's alleged conflict of interest and the sufficiency of the record on his direct appeal. The trial court denied the motion. Defendant's appeal from that decision is currently pending before this court in case No. 5-25-0256.

¶ 23    On March 25, 2025, defendant filed his sixth *pro se* motion for leave to file a successive postconviction petition (motion), which is the pleading at issue in this appeal. In the motion, defendant cited the letter, and attached it to the motion. Defendant again claimed that the letter demonstrated that the jury's verdict was based on racial bias. In particular, he claimed that the letter stated that its author, John Gergely, was taught "that black people man are guilty of violent crime," and that Gergely used this teaching, rather than the evidence presented at trial, to convict

10

defendant. Defendant claimed that he showed "cause" for not raising this claim in his initial postconviction petition because his claim was based upon case law that emerged after defendant's 2010 initial postconviction petition: *Pena-Rodriguez v. Colorado*, 580 U.S. 206 (2017), and *Ruiz v. Lumpkins*, 653 F. Supp. 3d 331 (N.D. Tex. 2023).

¶ 24    On March 28, 2025, the trial court denied the motion. The trial court stated that defendant's claims were "vague, unclear and conclusory," and that defendant did not support the claims with "any evidence as to what other jurors actually thought—just the thoughts of one juror who, despite his letter, admits he voted to find defendant guilty." The trial court found that cause and prejudice had not been shown. This timely appeal followed.

¶ 25                                    II. ANALYSIS

¶ 26    As noted previously, OSAD has filed a *Finley* motion to withdraw as counsel. In the legal memorandum that accompanies the motion, OSAD raises a single potential issue: whether it was error for the trial court to deny the motion. OSAD explains in detail why it believes defendant's claim fails to establish cause and prejudice, as required for the filing of a successive postconviction petition. For the reasons that follow, we agree with OSAD that the trial court did not err.

¶ 27    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2024)) provides a means by which a criminal defendant may assert that, in the proceedings that resulted in the defendant's conviction, there occurred a substantial denial of the defendant's rights under the United States Constitution, the Illinois Constitution, or both. *People v. Evans*, 2013 IL 113471, ¶ 10 (citing 725 ILCS 5/122-1(a)(1) (West 2008)). The Act allows the filing of only one postconviction petition without leave of court and expressly states that any claims not raised in the original petition or an amended petition are waived. *Id.* The Illinois Supreme Court has repeatedly held that because the deterrent effect of this state's criminal laws is undermined when criminal

11

convictions lack finality, the filing of successive postconviction petitions is highly disfavored, and is permissible in only very limited circumstances. See, *e.g.*, *People v. Montanez*, 2023 IL 128740, ¶ 73. Therefore, a defendant must obtain leave of court to initiate a successive postconviction proceeding. *Evans*, 2013 IL 113471, ¶ 10.

¶ 28    If the proposed successive postconviction petition does not raise a claim of actual innocence, leave of court is granted only if the defendant establishes cause for the defendant's failure to bring the claim in the original or amended petition, and establishes that prejudice to the defendant resulted from that failure. *Id.* To establish cause, a defendant must identify an objective factor that impeded the defendant's ability to raise a specific claim in the initial postconviction petition proceedings. *Id.* To demonstrate prejudice, the defendant must show that the claim not raised earlier so infected the trial that the defendant's resulting conviction or sentence violated the due process rights of the defendant. *Id.* The failure to establish either prong of the cause-and-prejudice test is fatal to the proposed successive postconviction petition and warrants its dismissal. See, *e.g.*, *People v. Smith*, 2014 IL 115946, ¶ 37. This court reviews *de novo* a trial court's denial of leave to file a successive postconviction petition. *People v. Parker*, 2019 IL App (5th) 150192, ¶ 17. We may affirm the trial court's judgment on any basis supported by the record, regardless of whether that was the basis relied upon by the trial court. See, *e.g.*, *People v. Kuehner*, 2022 IL App (4th) 200325, ¶ 67.

¶ 29    In this case, OSAD correctly notes that the motion does not establish prejudice, because to do so in the context of defendant's juror racial bias claim, defendant must present evidence that consists of specific allegations of prejudicial conduct or statements. See, *e.g.*, *People v. Williams*, 209 Ill. 2d 227, 241-42 (2004) (vague, general assertions of possible juror impropriety do not warrant evidentiary hearing in postconviction context). As OSAD further correctly notes, under

the decision of the United States Supreme Court in *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 225 (2017), an evidentiary hearing on alleged juror racial bias is warranted only if a defendant presents evidence "that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict." To meet this standard, the statements in question "must tend to show that racial animus was a significant motivating factor in the juror's vote to convict." *Id.* at 225-26. The reason for requiring such stringent and precise evidence is because there exists a long-recognized principle of law "that a jury verdict is not subject to impeachment by the testimony of a juror." *Williams*, 209 Ill. 2d at 239 (citing *People v. Hobley*, 182 Ill. 2d 404, 457 (1998)). To allow such impeachment as a general rule would allow all verdicts, in all jury trials, to be followed by an inquiry by the defeated party into the jury's deliberations, with the hope of discovering matters or materials that might invalidate the jury's verdict. *Id.* (citing *Tanner v. United States*, 483 U.S. 107, 119-20 (1987)). This, in turn, could lead to the harassment of jurors and ultimately to less open and honest deliberation by jurors, both of which would undermine the entire jury trial process. *Id.*

¶ 30    With these legal principles in mind, we turn to the specific allegation made by defendant in the motion: that the letter states that its author, Gergely, was taught "that black people man are guilty of violent crime," and that Gergely used this teaching, rather than the evidence presented at trial, to convict defendant. The letter, the full substantive content of which is set out above, does not state this. The closest the letter comes to making any such statement is that it states that "the racist structure of the criminal justice system and of our own culture teaches us to expect that a black man is responsible for a violent crime." The letter does not state that Gergely believed it to be true "that a black man is responsible for a violent crime," that he acted in accordance with any such belief, or that his vote to convict defendant was based upon anything other than the evidence

13

presented at trial. The remainder of the letter is a condemnation of racism, not an assertion that Gergely harbored a racial bias and acted in accordance with it when voting to convict defendant. Moreover, the letter never alleges that Gergely expressed a racial bias to the other jurors, who also voted to convict defendant.

¶ 31 With regard to the more broad allegation that defendant's conviction was the result of racial bias on the part of other jurors, the letter does not state that any juror—including Gergely—made any statement exhibiting overt racial bias. As noted above, the letter expresses Gergely's opinion that "the racist structure of the criminal justice system and of our own culture teaches us to expect that a black man is responsible for a violent crime." It also includes other opinions, clearly stated as Gergely's "beliefs" or as subjective impressions that were "apparent" to Gergely: (1) "I believe that most jurors were expecting to find [defendant] guilty from the moment they heard the charge," (2) "I believe that many jurors were unable to understand aspects of the case," (3) "I believe the evidence presented in court precluded any chance that [defendant] would receive a fair trial," (4) "It was apparent to me that many jurors were prepared to convict [defendant] based largely on the photographs of the defendant's [*sic*] injuries," and (5) "I don't believe the jury did its duty to find [defendant] guilty *beyond a reasonable doubt*." (Emphasis in original.)

¶ 32 The closest the letter comes to reporting an actual statement by a juror is when it alleges the following:

> "Most jurors spent their time during deliberations cracking jokes about the drudgery of jury service, condemning the family involved in this case for irresponsibility and poor parenting (again, racism is not an isolated problem in this context but a systemic characteristic of the criminal justice process), or speculating on aspects of the case that were clearly beyond the bounds of evidence the jury was instructed to consider."

Although the parenthetical statement in this excerpt arguably insinuates that Gergely believed the condemnation of the family involved was based on racial bias, the letter does not state expressly

14

that Gergely believed so, and it does not state facts that would support such a belief on the part of Gergely.

¶ 33 In addition, the letter does not state that Gergely's basis for making such an insinuation is any different than the basis for any of the other "beliefs" or subjective impressions he expresses in the letter: that they are his opinions, based upon, and derived from, his overarching opinion, expressed at the outset of the letter, "that the so-called justice system that [he] participated in" does not " 'protect[ ] all of our rights' " and is not "in any way a well-functioning social institution." Certainly Gergely is entitled to his opinions. However, his opinions are not facts, and the letter does not point to any actual statement from Gergely, or from any of his fellow jurors, that exhibited an overt racial bias. Moreover, as explained in detail above, the prospective jurors were questioned and instructed thoroughly and properly, and no person who served on the jury ever disclosed any personal bias, prejudice, or other belief that would support defendant's present claim. For all of these reasons, OSAD is correct that defendant has not shown prejudice for purposes of leave to file his successive postconviction petition, because he has not shown that his claim of alleged juror racial bias has any basis in fact, let alone that it so infected his trial that his resulting conviction violated his due process rights. See, *e.g.*, *Evans*, 2013 IL 113471, ¶ 10. For this reason, the trial court did not err in dismissing the motion. See, *e.g.*, *Smith*, 2014 IL 115946, ¶ 37 (failure to establish either prong of the cause-and-prejudice test is fatal to the proposed successive postconviction petition and warrants its dismissal).

¶ 34                                   III. CONCLUSION

¶ 35 This court's independent examination of the entire record establishes that this appeal does not present any issues of arguable merit. Therefore, the motion of appointed counsel to withdraw is granted, and the judgment of the circuit court of Champaign County is affirmed.

15

¶ 36    Motion granted; judgment affirmed.